**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

VOTERLABS, INC.,

       Plaintiff,

       v.

ETHOS GROUP CONSULTING
SERVICES, LLC,

       Defendant.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. _____

JURY TRIAL DEMANDED

PUBLIC VERSION

## COMPLAINT

Plaintiff, VoterLabs, Inc. ("VoterLabs"), by and through its undersigned counsel, on knowledge as to its own conduct and otherwise upon information and belief, hereby alleges the following against defendant Ethos Group Consulting Services, LLC ("Ethos Group").

### Nature of the Action

1.	VoterLabs seeks redress for (a) Ethos Group's breach of its contractual promise to make a periodic engagement payment to VoterLabs of $195,450; (b) Ethos Group's breach of its contractual promise to make a termination payment upon termination without cause equaling 8% of an expected royalty; and (c) Ethos Group's tortious scheme to avoid the termination payment by exploiting the inadequacies of compensatory remedies.

### Jurisdiction and Venue

2.	VoterLabs is a Connecticut corporation with its principal place of business in Branford, Connecticut.

3.	Ethos Group is a Delaware limited liability company with its principal place of business in Irving, Texas.

4.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332. VoterLabs is a citizen of Connecticut, and upon information and belief Ethos Group is not a citizen of Connecticut, for purposes of 28 U.S.C. § 1332, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5.    This Court also has personal jurisdiction over the parties and is the proper venue. Ethos Group is a Delaware limited liability company, and consented to suit in the United States District Court for the District of Delaware.

**The Parties**

**A.    VoterLabs**

6.    VoterLabs is a small business started in 2012 and majority owned and controlled by Walter Kawecki. VoterLabs offers data analytics, microtargeting, and custom software for political organizations and medium and enterprise clients that could benefit from using predictive analytics to understand and market to voters and consumers.

**B.    Ethos Group**

7.    Ethos Group is one of a number of related private companies owned and controlled by David Terek that together provides products and services to car dealerships in the United States through Ethos Groups' dealership participation programs, and also sells vehicle service contracts, extended warranties, GAP insurance, and other insurance products to everyday consumers who purchase or lease cars. Ethos Group and the related private companies together employ approximately 300 people and generate $300M/year in revenue.

8.    Ethos Group also has data developed, generated, produced, provided or otherwise sourced by Ethos Group that it wished to use to improve sales, utilizing data analytics, microtargeting, and/or custom software.

**Facts**

**A.    The 2016 NDA and Interim Agreement**

9.    In a Confidentiality and Non-Disclosure Agreement dated and executed on or about May 5, 2016 (hereinafter, the **"2016 NDA"**), VoterLabs and Ethos Group agreed to the terms for handling the exchange of confidential information to facilitate a definitive agreement between them.

10.    In a Service Agreement and Statement of Work dated December 20, 2016 and executed on or about January 18, 2017 (hereinafter, the **"Interim Agreement"**), VoterLabs agreed to review Ethos Group's data and perform "Data Enrichment and Analysis", generate "Customer Profiles", and perform "Product Opportunity Analysis" in return for $55,000.

11.    VoterLabs completed the work under the Interim Agreement and Ethos Group paid the $55,000 as promised.

12.    Regarding the "Product Opportunity Analysis", the Interim Agreement stated:

In performing and delivering the services, VoterLabs will gather information and perform analysis useful to possible future custom or joint product development for or with Ethos Group, such as generation of rudimentary predictive or prescriptive scoring models, or data integration and platform integration analysis.

13.    On or about March 28, 2017, VoterLabs emailed Ethos Group a document entitled "Master_Roadmap_March_2017_ETHGRP.pdf" (hereinafter, the **"Roadmap"**), which summarized VoterLabs' ideas resulting from the product opportunity analysis.

14.    On or about March 29, 2017, David Terek invited Walter Kawecki to Texas.

15.    On or about April 5, 2017, David Terek and Walter Kawecki had dinner, where they discussed the Interim Agreement and potential next steps.

16.    At the dinner, David Terek stated to Walter Kawecki that he wanted to make the relationship between Ethos Group and VoterLabs "permanent".

3

**B.**     **The April 6, 2017 Oral Agreement**

17.     On or about April 6, 2017, at an Ethos Group company meeting, David Terek stated during a presentation to a room full of people that he was contemplating an initial public offering, and further stated that VoterLabs was the missing piece to help Ethos Group go from an insurance and financial services business to a tech-oriented business worth exponentially more.

18.     At the same meeting, David Terek rejected VoterLabs' previous proposal that the parties adopt a standard proof of concept/pilot program approach typical for custom software development.

19.     At the same meeting, David Terek, acting on behalf of Ethos Group, made a counterproposal to Walter Kawecki as follows:

>     a.     Ethos Group would pay VoterLabs to work with Ethos Group IT professionals and develop the software at a fixed price determined in advance that estimated VoterLabs' cost;
>
>     b.     VoterLabs would own the IP associated with the software and the project (as the features and functionality would be broadly applicable to various use cases and across many industries);
>
>     c.     Ethos Group would receive exclusive rights in the automotive sector to use the software and the associated IP; and
>
>     d.     Upon completion of the software, Ethos Group would pay VoterLabs $1 per vehicle sold or leased by Ethos Group dealerships using the software in perpetuity as an easy to calculate royalty.

20.     At that time, Ethos Group's client dealerships sold or leased more than 500,000 cars/year.

21.     Walter Kawecki trusted David Terek and, acting on behalf of VoterLabs, orally agreed to the counterproposal (hereinafter, the "**April 6, 2017 Oral Agreement**").

**C.    The Project Overview**

22.    On or about April 24, 2017, VoterLabs emailed Ethos Group a document entitled "VoterLabs - Ethos Group Project Overview" (hereinafter, the **"Project Overview"**).

23.    The Project Overview identified three key software components (a/k/a "Feature Groups") from the Roadmap for VoterLabs to develop.

24.    The Project Overview estimated that it would take about 12 months for the core components of the software to be developed and deployed and an additional 6-12 months for the software to be fully matured (that is, tested and optimized after deployment).

25.    The Project Overview also stated:  "During the period of development and deployment, VoterLabs will go into 'hibernation'".

26.    The word "hibernation" referred to VoterLabs ceasing other work and the pursuit of other opportunities to focus exclusively on development of the software with Ethos Group.

27.    The Project Overview also stated:  "VoterLabs revenue model for this venture is based on recurring revenue from licensing, rather than maximizing profit for custom development."

28.    The Project Overview also attached an estimate of the cost to VoterLabs for the first twelve (12) months based on expectations at that time as follows:

      a.    Months 1-3:  $109,700
      b.    Months 4-6:  $142,950
      c.    Months 7-9:  $195,450
      d.    Months 9+:  $228,700

29.    Confirming the April 6, 2017 Oral Agreement of the parties, on or about June 12, 2017, Ethos Group wired VoterLabs $109,700.

30.    Further confirming the April 6, 2017 Oral Agreement of the parties, on or about September 14, 2017, Ethos Group wired VoterLabs $142,950.

**D.**    **The 2017 Written Agreement**

31.    In addition to working together on development of the software, the parties worked on memorializing the April 6, 2017 Oral Agreement reached between Ethos Group and VoterLabs into a written agreement.

32.    On or about October 22, 2017, VoterLabs' team visited Ethos Group in Texas, to meet and present an update on the development of the software.

33.    At the meeting, the parties agreed to renew their previous efforts to memorialize in writing the April 6, 2017 Oral Agreement reached between Ethos Group and VoterLabs.

34.    Negotiations occurred between October 22 and December 18, 2017.

35.    The negotiators were David Terek and William Surprise, Esq., co-general counsel of Ethos Group, for Ethos Group, and Walter Kawecki and Benjamin Wiles, Esq. of the law firm Updike, Kelley & Spellacy, for VoterLabs.

36.    Attorneys William Surprise and Benjamin Wiles kept a master draft into which the parties inserted edits with changes tracked.

37.    The parties traded numerous drafts between October 23 and December 18, 2017.

38.    On or about December 18, 2017, Ethos Group and VoterLabs executed a Service Agreement and Statement of Work dated October 23, 2017 (the "**2017 Written Agreement**").

39.    The 2017 Written Agreement subsumed the April 6, 2017 Oral Agreement.

**1.**    **Engagement Payments**

40.    In the 2017 Written Agreement, the parties memorialized that VoterLabs would employ an "agile development model".

41.    Agile development is an iterative software development methodology, that allows for changes and adjustments to be made during development to take into account such things as

6

feedback gained from user testing, advances in technology, and changes in the marketplace. Agile development contrasts with the "waterfall" approach, where an extensive plan is set from the start and then followed carefully, leaving little room for flexibility or change.

42.    The payments under the April 6, 2017 Oral Agreement for VoterLabs' performance of agile development work were called "Engagement Payments" in the 2017 Written Agreement.

43.    Specifically, the parties agreed:

Engagement Payments. In the consideration of development of the Feature Groups, Customer will make payments (the "Engagement Payments") as indicated immediately below:

| Payment Number | Condition / Timing | Payment Amount |
|---|---|---|
| 1 | 6/12/2017 | $109,700.00 (both parties agree that this payment was already paid and received on 6/12/17) |
| 2 | 90 Days After Receipt of Payment Number 1 | $142,900 |
| 3 | 90 Days After Receipt of Payment Number 2 | $195,450 |
| 4 | 90 Days After Receipt of Payment Number 3 | $228,700 |
| 5 | 90 Days After Receipt of Payment Number 4 | Between $195,450 and $228,700, final amount TBD |
| 6 | 90 Days After Receipt of Payment Number 5 | Between $195,450 and $228,700, final amount TBD |
| 7 | 90 Days After Receipt of Payment Number 6 | Up to $228,700, final amount TBD (this payment will only be for any necessary outstanding development, integration, or optimization to deliver final Deliverables) |
| 8 | 90 Days After Receipt of Payment Number 7 | Up to $228,700, final amount TBD (this payment will only be for any necessary outstanding development, integration, or optimization to deliver final Deliverables) |

44.    Although the "Engagement Payments" provision stated that only Engagement Payment No. 1 had already been paid, in fact both Engagement Payment Nos. 1 and 2 had already been paid on or about June 12, 2017 and September 14, 2017, respectively.

45.     Pursuant to the "Engagement Payments" provision, so long as the 2017 Written Agreement was in effect, and VoterLabs substantially complied, Ethos Group was contractually committed to make the identified payments on or at a reasonable time after June 12, 2017 (Engagement Payment No. 1), September 10, 2017 (Engagement Payment No. 2), December 9, 2017 (Engagement Payment No. 3), March 9, 2018 (Engagement Payment No. 4), June 7, 2018 (Engagement Payment No. 5), and September 5, 2018 (Engagement Payment No. 6).

46.     As noted above, on or about December 18, 2017, Ethos Group and VoterLabs executed the 2017 Written Agreement.

47.     On or about December 22, 2017, Ethos Group wired VoterLabs $195,540—Engagement Payment No. 3 contemplated by the 2017 Written Agreement.

**2.      Termination Payment**

48.     The 2017 Written Agreement provides that VoterLabs shall be entitled to the "Base Royalty" paid during the "Base Royalty Term" upon completion of the software.

49.     "Base Royalty" is defined as: "a royalty of (a) one dollar ($1.00) per Vehicle sold by or through a Monthly User ("Monthly Royalty") or (b) two hundred and fifty thousand dollars ($250,000) per year ("Yearly Minimum Royalty"), whichever is greater".

50.     "Base Royalty Term" is defined as: "a period of ninety-nine (99) years from the SOW Effective Date".

51.     "SOW Effective Date" is defined as: "October 23, 2017".

52.     Accordingly, at the time of execution of the 2017 Written Agreement, the Base Royalty paid during the Base Royalty Term was an amount expected to be a minimum of about $24,500,000 (= $250,000 minimum/year x 98 years).

53.     Given the overall structure and surrounding circumstances of the April 6, 2017 Oral Agreement and the subsequent 2017 Written Agreement—including where development would take a number of months in which VoterLabs would be in "hibernation" and would not profit until completion and receipt of the royalty—VoterLabs sought (and despite some resistance received) appropriate contractual protection.

54.     Specifically, from the earliest drafts of the 2017 Written Agreement, the parties contemplated Ethos Group having the right to terminate without cause by giving sixty (60) days written notice, coupled with a termination payment by Ethos Group to VoterLabs triggered at various times and calculated in various ways.  The parties traded numerous drafts deleting, inserting, and/or altering in material ways the termination payment language.

55.     In the final executed 2017 Written Agreement, the parties agreed in Service Agreement § 8.2 that Ethos Group could terminate without cause by giving sixty (60) day written notice, and in Statement of Work § 4(a) that:

> Except as mutually agreed upon by the parties, upon termination of the Agreement or this SOW for any reason, Customer [Ethos Group] shall pay to Service Provider [VoterLabs], during the Base Royalty Term, 1% of the Base Royalty for each full month that has elapsed between the SOW Effective Date and the date of termination.

56.     The words used by the parties literally say (paraphrasing for simplicity) that upon termination for any reason, Ethos Group shall pay VoterLabs, during a 99 year period starting October 23, 2017, 1% of $250,000/year minimum or $1/vehicle paid monthly, whichever is greater, for each full month that elapses between October 23, 2017 and the date of termination.

57.     The precise meaning and purpose of the termination payment language in Statement of Work § 4(a) is not immediately apparent.

### 3.    Forthright Negotiator Principle

58.    During negotiations, the parties both used the word "royalty" (lowercase) or similar phrases like "royalty fee" and "royalty payments" to refer to the overall total amount of the Base Royalty (an amount per month or year) paid during the Base Royalty Term (99 years).

59.    For example, on or about November 6, 2017, William Surprise wrote: "Termination Fee.   Ethos Group respectfully disagrees with the proposed termination fee provision (wherein Ethos Group pays a percentage of the royalty fee based upon time of the agreement).   However, Ethos Group would like to propose a modification.   Upon termination Ethos Group will pay a one-time fee of $250,000."

60.    On or about November 21, 2017, Walter Kawecki emailed David Terek and William Surprise a draft contract in PDF form with proposed language for terms still subject to negotiation, including proposed termination payment language, along with comments on the meaning and rationale associated with each (the "**2017 Notes**").

61.    Comment 17 on the proposed termination payment language stated as follows:

Royalty pertains.  Except as mutually agreed by the parties, upon termination of the Agreement or this SOW for any reason, Customer shall pay to Service Provider, during the Base Royalty Term, 1% of the Base Royalty for each full month that has elapsed between the SOW Effective Date and the date  of such termination.  Customer shall provide.

**Commented [WJK17]:** As agreed to, termination payment = 1% of royalty for each month before license/royalty payments start.

•This protects VoterLabs in case whoever controls Ethos Group exercise their right to *terminate for any reason* with only 60 days notice.

•The "Except as mutually agreed "to part means we have the flexibility to figure this out around a table in the unlikley event it were to ever be an issue.

•Note: 1% starts last month (Oct 1), instead of when the first payment was received a few months back.

62.     Comment 17 forthrightly conveys VoterLabs' position that, in return for Ethos Group's right to terminate without cause (that is, the "right to terminate for any reason with only 60 days notice") prior to completion of the software (and therefore "before the license/royalty payments start"), Ethos Group must agree to make a one-time "termination payment" (singular) to VoterLabs equal to 1% of the royalty (that is, the overall total amount of the Base Royalty paid during the Base Royalty Term) contemplated by the agreement, multiplied by the number of months that elapse between the effective date of the agreement and the date of termination.

63.     On or about November 21, 2017, William Surprise for Ethos Group responded to Walter Kawecki's November 21, 2017 email, stating:  "Thank you for sharing the document.  If possible, would you please send us a word version of the attached document."

64.     On or about November 22, 2017, Walter Kawecki replied to William Surprise's November 21, 2017 email by attaching the draft in Word.

65.     On or about November 27, 2017, William Surprise typed the termination payment language proposed by Walter Kawecki into the master draft used to track changes made during the drafting process, making only the following edits:

| Walter Kawecki 11/21/2017 | William Surprise 11/27/2017 |
|---|---|
| Except as mutually agreed by the parties, upon termination of the Agreement or this SOW for any reason, Customer [Ethos] shall pay to Service Provider [VoterLabs], during the Base Royalty Term, 1% of the Base Royalty for each full month that has elapsed between the SOW Effective Date and the date of such termination | Except as mutually agreed **upon** by the parties, upon termination of the Agreement or this SOW for any reason, Customer [Ethos] shall pay to Service Provider [VoterLabs], during the Base Royalty Term, 1% of the Base Royalty for each full month that has elapsed between the SOW Effective Date and the date of ~~such~~ termination |

66.     On or about November 30, 2017, on behalf of Ethos Group, William Surprise emailed Walter Kawecki, attaching the updated master version into which he typed the termination payment language.

11

67. Between November 30, 2017 and December 18, 2017, the parties exchanged the master draft back and forth additional times with various substantive changes. Neither party made any further change to the termination payment language.

68. On or about December 18, 2017, Ethos Group and VoterLabs executed the 2017 Written Agreement with the termination payment provision language proposed by Walter Kawecki on or about November 21, 2017 as edited by William Surprise on or about November 27, 2017.

## E.     Termination Without Cause

69. From the beginning, Jeff Thomas led the project from the Ethos Group side, and VoterLabs' engineers and Ethos Group's IT team worked together in an amicable manner.

70. Upon information and belief, sometime around December 2017, Ethos Group hired two new executives: Scarlett Shipp and Don Judice.

71. Scarlett Shipp formerly served as the President of the Synergy Division of CRIF Lending Solutions, which, among other things, provided consulting and software to companies in the financial services industry and automotive sector.

72. Don Judice formerly served in various C-level management roles in the automotive sector.

73. In February 2018 and continuing thereafter, VoterLabs struggled to set up meetings with Ethos Group to advance the project.

74. On or about March 9, 2018 or at a reasonable time thereafter, when Engagement Payment No. 4 of $228,700 became payable, Ethos Group failed to pay.

75. Walter Kawecki sent repeated reminders and made inquiries to Ethos Group to determine the reason for the delayed payment.

12

76.    On or about April 4, 2018, Walter Kawecki received a surprise email from Scarlett Shipp seeking to speak with him about the project.  Prior to this point, as far as VoterLabs knew, Scarlett Shipp had not been involved in any meaningful way in the project.

77.    On or about April 5, 2018, Walter Kawecki spoke with Scarlett Shipp by telephone.

78.    On the call, Scarlett Shipp stated that Ethos Group and VoterLabs should "take a pause" on development.

79.    In response, Walter Kawecki explained that VoterLabs agreed to do the work at a fixed price estimating its cost and that pausing development was not an option because it would harm VoterLabs.  Walter Kawecki also emphasized VoterLabs' concerns about the delays from Ethos Group with moving the project forward.

80.    In reply, Scarlett Shipp expressed appreciation for the position of VoterLabs (the idea conveyed was that she was used to being in VoterLabs' position as service provider) and offered herself as someone at Ethos Group who would help VoterLabs move the project forward.

81.    On or about April 6, 2018, the next day, during a regularly scheduled bi-weekly check-in call with Ethos Group's IT team, or near in time to it, a long-time, high-level Ethos Group IT professional conveyed to Walter Kawecki in sum and substance that Scarlett Shipp had unclear motives regarding the project and he did not want VoterLabs to be "ambushed" by her (specifically, that Scarlett Shipp might speak unfairly and/or incorrectly about the project to David Terek).  This Ethos Group employee suggested that so long as Ethos Group IT personnel with knowledge of the project were present in meetings then that should protect the project from whatever Scarlett Shipp's motives might be.

82. On or about April 10 and 11, 2018, VoterLabs and Ethos Group's teams met in Texas. Scarlett Shipp and Don Judice attended the meetings in place of David Terek.

83. During the meetings, Scarlett Shipp through words and conduct expressed support for the project and VoterLabs' work.

84. After meetings in Texas, Walter Kawecki conveyed to David Terek that he would keep an open mind and work cooperatively with Scarlett Shipp.

85. On or about April 24, 2018, Scarlett Shipp and Don Judice traveled to New Haven, Connecticut to meet with VoterLabs' team.

86. At the meeting, the parties reaffirmed a previously agreed-to June 2018 deployment date for a key piece of the software, as well as an October 2018 deployment date for additional key features.

87. At the same meeting, Scarlett Shipp stated to Walter Kawecki that Ethos Group needed to own the software and its associated IP. This new request was contrary to the 2017 Written Agreement. Nonetheless, in response, Walter Kawecki expressed a willingness to discuss possible amendment of the 2017 Written Agreement to accommodate Scarlett Shipp's new request.

88. On or about April 26, 2018, Ethos Group wired Engagement Payment No. 4 of $228,700.

89. Engagement Payment No. 4 was more than a month late.

90. On May 2, 2018, Scarlett Shipp emailed VoterLabs. The email stated:

Hello Walter, It was really good to meet with you and the team last week. Per our conversations, attached is an amendment to the current contract. After this amendment, we can discuss the modifications for the intellectual property. The first step is to deliver the first module as is and get it in to the market for testing. Jeff is identifying 3 stores that use the same CRM. We want to stop all development until we have an

14

understanding of how this module is going to perform and what if any modifications need to occur.

91.    The amendment attached to Scarlett Shipp's May 2, 2018 email in substance eliminated Ethos Group's obligation to make Engagement Payments, without terminating the 2017 Written Agreement.

92.    At no previous point did anyone discuss such an amendment, including during the April 24, 2018 meeting in Connecticut or at any other time.  In addition, Scarlett Shipp's request to "stop all development", and the reasons why it conflicted with the 2017 Written Agreement and if done would harm VoterLabs, had already been discussed on the April 5, 2018 call between her and Walter Kawecki.

93.    The next day, on or about May 3, 2018, Walter Kawecki called David Terek and indicated that he believed Scarlett Shipp's May 2, 2018 email and proposed amendment was hostile and contrary to the 2017 Written Agreement.  In response, David Terek promised he would look into what was happening and call back.

94.    On May 18, 2018, David Terek finally called Walter Kawecki back and stated that Ethos Group would probably terminate the 2017 Written Agreement.

95.    On May 21, 2018, William Surprise, on behalf of Ethos Group, delivered by email and overnight mail a notice of termination which stated in relevant part (italics in original):

> We hereby notify you that we have elected, pursuant to Section 8.2 of the Agreement, to terminate the Agreement and the related Statement of Work Number 1, sixty (60) days from the date of this notice.  In accordance with this election, we respectfully request that you *immediately cease all services as of the date of this letter*.  Further, in accordance with Section 8.4 we respectfully ask for you to return all our of property, equipment, Confidential Information, and permanently erase all Confidential Information from your computer systems. We would ask, in accordance with Section 8.4(f) that you certify you have completed all requirements of Section 8.4.  Please direct any questions to Scarlett Shipp.

> (emphasis in original)

96.     The notice of termination cited and relied on § 8.2 of the 2017 Written Agreement, which allowed Ethos Group to terminate without cause by giving sixty (60) days notice.

97.     Sixty (60) days from May 21, 2018 was July 20, 2018.

98.     The notice of termination also cited § 8.4 of the 2017 Written Agreement, which among other things provided that VoterLabs had to "[d]eliver to Customer [Ethos Group] all documents, work product, and other materials, whether or not complete, prepared by or on behalf of Service Provider [VoterLabs] in the course of performing the Services for which Customer [Ethos Group] has paid".

99.     Delivering the unfinished software fell within the scope of § 8.4.

100.    Termination, however, ceased Ethos Group's right to the necessary licenses.

101.    On May 30, 2018, Walter Kawecki traveled to Texas to meet with Ethos Group to discuss what was to happen next.

102.    David Terek and Scarlett Shipp attended on behalf of Ethos Group.

103.    In the meeting, Walter Kawecki noted that (a) Engagement Payment No. 5 of about $200,000 would be payable before the date of termination and therefore was required to be made and (b) that Ethos Group's termination without cause also triggered a termination payment.

104.    David Terek, on behalf of Ethos Group, stated he would pay the $200,000 engagement payment but responded negatively to Ethos Group's obligation to make a termination payment.

105.    Ostensibly relying upon the "[e]xcept as mutually agreed upon by the parties" exception to the termination payment provision, David Terek instructed Scarlett Shipp to figure out an alternative way forward.

16

F.     **Ethos Group's Tortious Conduct**

106.     In the May 30, 2018 meeting, after David Terek left, Walter Kawecki and Scarlett Shipp discussed possible ways forward.

107.     Scarlett Shipp requested that VoterLabs re-engineer the software to be a standalone product disconnected from VoterLabs' data engine (*i.e.*, not reliant on VoterLabs' data inputs as was the original plan in the 2017 Written Agreement) and deliver the software in a deployable state but otherwise as is to Ethos Group by the end of June 2018.

108.     Walter Kawecki conveyed that, while VoterLabs performed that work, Ethos Group should consider and propose a "non-nominal" amount in addition to the $200,000 engagement payment for the necessary licenses and a release from the termination payment obligation.

109.     On or about June 7, 2018 or at a reasonable time thereafter, the scheduled payable date for Engagement Payment No. 5 of $195,450, Ethos Group failed to pay.

110.     On or about June 25, 2017, Walter Kawecki emailed Scarlett Shipp informing her that the software would be ready for delivery as planned, and seeking to schedule time with Ethos Group's IT staff to walk them through installation and deployment as well as the custom-built tools delivered with the software.  In the same email, Walter Kawecki also inquired as to status of Ethos Group's proposal for the necessary licenses and a release from the termination payment obligation.

111.     On or about June 25, 2018, Scarlett Shipp, on behalf of Ethos Group, replied to Walter Kawecki, stating:

> Hello Walter, We are not going to take the in-store software at this time.  We will pass on it for the time being.  Given the change in focus, we aren't going to deploy.  Legal is still working on the draft.  They have had several high priority items.  William [Surprise] and

17

I [are] working together.  He is doing the best he can. They have just been dealing with some crucial items. Sorry for the delay.  Let me know if you want to talk.

112.    On or about July 13, 2018, Scarlett Shipp, on behalf of Ethos Group, emailed Walter Kawecki a "Release Agreement" and a "Patent License".

113.    The "Release Agreement" and "Patent License" together called for a release of all past, present, and future claims known or unknown (which would have included a release from the termination payment obligation) and the grant by VoterLabs to Ethos Group of a perpetual, irrevocable, worldwide, royalty-free license to VoterLabs' patents.  In return, Ethos Group would pay VoterLabs $200,000.

114.    In the July 13, 2018 email, Scarlett Shipp denied that Ethos Group promised to make a termination payment in the event Ethos Group terminated without cause during development and prior to completion of the software.

115.    At the time she sent the July 13, 2018 email, Scarlett Shipp and William Surprise were aware of the 2017 Notes and, in particular, the comments contained therein on the meaning and rationale associated with the termination payment provision language.

116.    On or about July 13, 2018, the same day, Walter Kawecki called Ethos Group to discuss Scarlett Shipp's email proposal.  Benjamin Wiles joined for VoterLabs.  Scarlett Shipp, Don Judice, and William Surprise joined for Ethos Group.  Walter Kawecki asked whether Ethos Group was proposing $200,000 for the release and patent license in addition to the $200,000 already owed for the engagement payment.  Scarlett Shipp and Don Judice stated in sum and substance:  No, one payment of $200,000 was all VoterLabs would receive.

117.    On the call, Walter Kawecki explained that the $200,000 was for Engagement Payment No. 5, and asked in substance why Ethos Group thought it could withhold an amount already owed to obtain a release and patent license.

18

118.    In response, on the July 13, 2018 call, William Surprise stated that Engagement Payment No. 5 is arguably not required because Engagement Payment No. 5 is not payable until "90 Days After Receipt of Payment Number 4", and Engagement Payment No. 4 was paid/received on April 26, 2018 (over a month late).  Consequently, he argued that the 2017 Written Agreement does not require Engagement Payment No. 5 to be made until 90 days after April 26, 2018, which is July 25, 2018.  Thus, he reasoned, because that date is after the termination date, July 20, 2018, Engagement Payment No. 5 is arguably not required.

119.    Thereafter, William Surprise reiterated this position on Engagement Payment No. 5 while refusing to discuss its merits.

120.    Walter Kawecki attempted to appeal to David Terek to intervene, but David Terek refused and through inaction supported Scarlett Shipp and William Surprises' unjustified efforts to withhold money without probable cause to force VoterLabs to give up its contractual and property rights.

121.    To date, Ethos Group has failed to make the Engagement Payment No. 5.

122.    To date, Ethos Group has failed to make the termination payment.

**COUNT 1:    Breach of Contract - Payment Number Five (Service Agreement § 8.2 and Statement of Work § 4(a))**

123.    VoterLabs incorporates the allegations contained in paragraphs 1-122 of the Complaint as if fully alleged in this paragraph 123.

124.    The 2017 Written Agreement constitutes a valid, binding, and enforceable contract by and between plaintiff VoterLabs and defendant Ethos Group.

125.    VoterLabs has complied in all material respects with its obligations under the 2017 Written Agreement.

19

126. Ethos Group breached the 2017 Written Agreement by failing to make Engagement Payment Number 5 on June 7, 2018 or within a reasonable time thereafter.

**COUNT 2:** **Breach of Contract - Termination Payment (Service Agreement § 8.2 and Statement of Work § 4(d))**

127. VoterLabs incorporates the allegations contained in paragraphs 1-126 of the Complaint as if fully alleged in this paragraph 127.

128. Ethos Group breached the 2017 Written Agreement by failing to pay make the termination payment on July 20, 2018 or within a reasonable time thereafter.

**COUNT 3:** **Intentional Tort - Malicious Conduct in Aid of an Oppressive Scheme**

129. VoterLabs incorporates the allegations contained in paragraphs 1-128 of the Complaint as if fully alleged in this paragraph 129.

130. Ethos Group asserted a frivolous position to withhold Engagement Payment Number 5, with the explicit aim of capturing un-bargained-for benefits based on an expectation that transaction costs associated with the legal system would make it impossible for VoterLabs to do anything but give up its contractual and property rights.

**REQUEST FOR RELIEF**

WHEREFORE, plaintiff demands judgment against the defendant and respectfully requests that the Court award damages as follows:

      a)     $195,450;

      b)     8% of the expected royalty under the 2017 Written Agreement;

      c)     Interest pursuant to 6 Del. Stat. § 2301;

d)      Consequential and exemplary damages in an amount to be determined;

e)      Costs of suit; and

f)      Any other relief the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

| | |
|---|---|
| *Of Counsel*: | /s/ Gregory V. Varallo |
| | Gregory V. Varallo (#2242) |
| James W. Bergenn, Esq. | Matthew W. Murphy (#5938) |
| Christopher J. Cahill, Esq. | RICHARDS, LAYTON & FINGER, P.A. |
| SHIPMAN & GOODWIN LLP | 920 North King Street |
| One Constitution Plaza | Wilmington, DE 19801 |
| Hartford, Connecticut 06103-1919 | (302) 651-7700 |
| Tel.: (860) 251-5000 | (302) 651-7701 |
| Fax: (860) 251-5219 | varallo@rlf.com |
| jbergenn@goodwin.com | murphy@rlf.com |
| ccahill@goodwin.com | |
| | *Attorneys for Plaintiff VoterLabs, Inc.* |

Dated: March 15, 2019

21