IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

VOTERLABS, INC.,                    )
                                    )
            Plaintiff,              )
                                    )
    v.                              )        Civil Action No. 19-524-RGA
                                    )
ETHOS GROUP CONSULTING              )
SERVICES, LLC,                      )
                                    )
            Defendant.              )

## REPORT AND RECOMMENDATION

### I.    INTRODUCTION

Presently before the court in this breach of contract action is a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Federal Rule of Civil Procedure 12(b)(6) filed by defendant Ethos Group Consulting Services, LLC ("Ethos"). (D.I. 10) For the following reasons, the court recommends GRANTING-IN-PART and DENYING-IN-PART defendant's motion to dismiss.[1]

### II.   BACKGROUND[2]

#### a.   The Parties

Plaintiff VoterLabs, Inc. ("VoterLabs") is a Connecticut corporation with its principal place of business in Branford, Connecticut. (D.I. 2 at ¶ 2) Voterlabs is majority owned and controlled by Walter Kawecki ("Mr. Kawecki"). (*Id.* at ¶ 6) VoterLabs offers data analytics,

---

[1] The briefing for the pending motion is as follows: defendant's opening brief in support of its motion to dismiss (D.I. 11), plaintiff's answering brief (D.I. 14), defendant's reply brief (D.I. 15), and plaintiff's sur-reply brief (D.I. 19).

[2] The facts in this section are based upon allegations in VoterLabs' complaint, which the court accepts as true for the purposes of the pending motion to dismiss. *See Umland v. Planco Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).

microtargeting, and custom software for political organizations and other clients that could benefit from predictive analytics. (*Id.*) In the case at bar, the proposed software would be used for the purpose of analyzing a customer's financial and purchasing history in order to make recommendations with respect to motor vehicle purchases.

Ethos is a Delaware limited liability company with its principal place of business in Irving, Texas. (*Id.* at ¶ 3) Ethos is owned and controlled by David Terek ("Mr. Terek"). (*Id.* at ¶ 7) Ethos provides products and services to car dealerships, selling vehicle service contracts and insurance products to consumers who purchase or lease cars. (*Id.*)

## b. Procedural History

On March 15, 2019, plaintiff originally filed this action. (D.I. 2) On April 8, 2019, defendant filed the present motion to dismiss. (D.I. 10)

## c. Facts

This action arises from an alleged breach of contract and a related claim of tortious breach of duty. Plaintiff has asserted three claims against defendant: breach of contract for failure to remit Engagement Payment number five in Count I, breach of contract for failure to remit a termination payment in Count II, and malicious conduct in aid of an oppressive scheme in Count III. (D.I. 2 at ¶¶ 123-130)

On January 18, 2017, VoterLabs and Ethos entered into a Service Agreement and Statement of Work, wherein VoterLabs agreed to review Ethos' data and perform "Data Enrichment and Analysis," generate "Customer Profiles," and perform "Product Opportunity Analysis." (D.I. 2 at ¶ 10) Following VoterLabs' completion of this work, Mr. Kawecki and Mr. Terek wished to continue VoterLabs and Ethos' business relationship. (*Id.* at ¶¶ 11-16) On April 6, 2017, Mr. Terek proposed that: (1) Ethos would pay VoterLabs to work with Ethos

2

professionals and develop software at a fixed price, (2) VoterLabs would own intellectual property associated with the software and project, (3) Ethos would receive exclusive rights in automotive sector to use the software and associated intellectual property, and (4) upon completion of the software, Ethos would pay VoterLabs $1 per vehicle sold or leased by Ethos dealerships using the software in perpetuity. (*Id.* at ¶ 19) Mr. Kawecki and Mr. Terek orally agreed to this proposal. (*Id.* at ¶ 21)

On or about April 24, 2017, VoterLabs emailed Ethos a document entitled "VoterLabs – Ethos Group Project Overview" (the "Project Overview"), which identified three key software components (the three "Feature Groups") for VoterLabs to develop.[3] (*Id.* at ¶¶ 22-23) The Project Overview had an attached estimate of VoterLabs' costs for the first twelve months of development. (*Id.* at ¶ 28)

After several months of negotiations, VoterLabs and Ethos memorialized their oral agreement in a Service Agreement (the "Agreement") and Statement of Work ("SOW") on or about December 18, 2017. (*Id.* at ¶¶ 31, 34, 37-38) The Agreement stated that VoterLabs would employ an agile development model, which allowed for changes and adjustments to be made during the development of software. (*Id.* at ¶¶ 40-41) Each of the eight payments for VoterLabs' performance of agile development work (the "Engagement Payments") was due ninety days after the receipt of the previous payment. (*Id.* at ¶¶ 42-43; D.I. 11, Ex. B at § 4(d)) Ethos made the first Engagement Payment on June 12, 2017, and the second Engagement Payment on September 14, 2017. (D.I. 2 at ¶¶ 29-30, 44) On December 22, 2017, Ethos made the third Engagement Payment. (*Id.* at ¶ 47)

---

[3] The software was to include three "Feature Groups" identified as follows: (1) "'Terra' In-Store Employee Application," (2) "'In-Market Intelligence' Application," and (3) "'Exo' AutoConsumerDaily.com / CarConsumer.Com, etc." (D.I. 15, Ex. A)

Around December 2017, Ethos hired two new executives, Scarlet Shipp ("Ms. Shipp") and Don Judice ("Mr. Judice"). (*Id.* at ¶ 70) On April 5, 2018, Mr. Kawecki spoke with Ms. Shipp, who suggested that Ethos and VoterLabs pause development. (*Id.* at ¶ 78) On April 24, 2018, Ms. Shipp told Mr. Kawecki that Ethos needed to own the software and its associated intellectual property. (*Id.* at ¶¶ 85-87) Mr. Kawecki expressed a willingness to discuss a possible amendment to the Agreement. (*Id.* at ¶ 87) On April 26, 2018, Ethos made the fourth Engagement Payment, approximately one month late. (*Id.* at ¶¶ 88-89)

On May 2, 2018, Ms. Shipp emailed VoterLabs and attached an amendment which eliminated Ethos' obligation to make Engagement Payments. (*Id.* at ¶¶ 90-91) On May 21, 2018, Ethos mailed a notice of termination, which cited the Agreement's termination clause. (*Id.* at ¶¶ 95-96; D.I. 11, Ex. A at § 8.2) On May 30, 2018, Mr. Kawecki met with Ethos and noted that the fifth Engagement Payment was payable prior to the date of termination and that Ethos' termination triggered a termination payment under the Agreement. (D.I. 2 at ¶¶ 101-103) On July 13, 2018, Ms. Shipp emailed Mr. Kawecki a "Release Agreement" and a "Patent License," which called for the release of all past, present, and future claims, in addition to a perpetual, irrevocable, worldwide, royalty-free license to VoterLabs' patents. (*Id.* at ¶¶ 112-113) In exchange, Ethos stated that it would make the fifth Engagement Payment. (*Id.* at ¶¶ 113-117, 120)

Ethos' termination became effective on July 20, 2018. (*Id.* at ¶¶ 96-98) To date, Ethos has failed to make the fifth Engagement Payment or the termination payment. (*Id.* at ¶¶ 121-122)

### d. The Agreement and the SOW[4]

The Agreement includes a termination clause at section 8.2, which states:

> [Ethos], in its sole discretion, may terminate this Agreement or any Statement of
> Work, in whole or in part, at any time without cause, and without liability except
> for required payment for services rendered, and reimbursement for authorized
> expenses incurred, prior to the termination date, by providing at least 60 days'
> prior written notice to [VoterLabs].

(D.I. 11, Ex. A at § 8.2) The Agreement also includes a remedies provision which sets forth

VoterLabs' "earned but unpaid fees" as the exclusive remedy for Ethos' payment breach.[5] (*Id.* at

§ 11.3) The Agreement also contains an integration clause.[6] (*Id.* at § 13)

The SOW provides for royalty payments in section 4(a):

> Upon the completion of all three Feature Groups, [VoterLabs] shall be entitled to
> a royalty of (a) one dollar ($1.00) per each Vehicle sold by or through a Monthly
> User ("Monthly Royalty") or (b) two hundred and fifty thousand dollars
> ($250,000) per year ("Yearly Minimum Royalty"), whichever is greater
> (collectively, "Base Royalty"). . . . The Base Royalty shall last for a period of
> ninety-nine (99) years from the SOW effective date ("Base Royalty Term"), after
> the ninety-nine (99) years [Ethos] shall have the right to use the Feature Groups
> without payment of Base Royalty. During development and prior to completion
> of all three Feature Groups, the Base Royalty may, at the sole discretion of
> [Ethos], be separated into multiple parts for each Feature Group – for example,
> thirty percent (30%) of the Base Royalty may be earned and payable upon the
> completion of Feature Group Terra In-Store Employee Application Suite. On an

---

[4] The Agreement and the SOW were incorporated by reference in the complaint. (D.I. 2; D.I. 11, Ex. A; Ex. B)

[5] Section 11.3 of the Agreement states: "Except for a breach of Section 7, all rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute in any other agreement between the Parties, or otherwise. Despite the previous sentence, the Parties intend that [VoterLabs'] exclusive remedy for [Ethos'] payment breach shall be its right to damages equal to its earned but unpaid fees." (D.I. 11, Ex. A at § 11.3)

[6] Section 13 of the Agreement states: "With the exception of the Confidentiality and Non-Disclosure Agreement entered into by the Parties on May 5th, 2016, this Agreement, including and together with any related exhibits, schedules, attachments, and appendices, constitutes the sole and entire agreement of the Parties with respect to the subject matter contained herein, and supersedes all prior and contemporaneous understandings, agreements, representations, and warranties, both written and oral, regarding such subject matter." (D.I. 11, Ex. A at § 13)

> annual basis, the parties shall assess the extent to which Feature Group components have been completed, expressed as a percentage, and upon [Ethos'] sole discretion, such percentage of the Base Royalty may be payable to [VoterLabs] thereafter. Any agreed-upon portion of the Base Royalty shall be referred to herein as a "Partial Base Royalty" and, notwithstanding the first clause of this Section 4(a), shall be payable upon the completion of the Feature Group or portion thereof to which such Partial Base Royalty pertains. Except as mutually agreed upon by the parties, upon termination of the Agreement or this SOW for any reason, [Ethos] shall pay to [VoterLabs], during the Base Royalty Term, 1% of the Base Royalty for each full month that has elapsed between the SOW Effective Date and the date of termination. . . . For the avoidance of doubt, this Section 4(a) shall survive the termination of the Agreement or this SOW.

(D.I. 11, Ex. B at § 4(a)) Furthermore, the SOW contains a provision on Engagement Payments, wherein Ethos was to make each payment in consideration of development of the Feature Groups ninety days after the receipt of the previous payment. (*Id.* at § 4(d))

## III. LEGAL STANDARD

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). When considering a Rule 12(b)(6) motion to dismiss, the court must accept as true all factual allegations in the complaint and view them in the light most favorable to the plaintiff. *See Umland v. Planco Fin. Servs.*, 542 F.3d 59, 64 (3d Cir. 2008).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

The court's determination is not whether the non-moving party "will ultimately prevail," but whether that party is "entitled to offer evidence to support the claims." *United States ex rel. Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## IV.    DISCUSSION

### a.    Count I – Breach of Contract for Unpaid Engagement Payment Number Five

Ethos argues that Count I should be dismissed because, on May 21, 2018, Ethos instructed VoterLabs to immediately cease all services before the fifth Engagement Payment in the amount of $195,450 became due on June 7, 2018, and VoterLabs failed to plead damages as a result of the non-payment. (D.I. 11 at 8-10) Ethos avers that VoterLabs had no authority to continue spending fees or incurring costs in developing the Feature Groups after May 21, 2018, the date that Ethos mailed its notice of termination. (*Id.* at 9)

However, the Agreement permits termination at any time without cause, "without liability except for required payment for services rendered, and reimbursement for authorized expenses incurred, *prior to the termination date*, by providing at least 60 days' prior written notice to [VoterLabs]." (D.I. 11, Ex. A at § 8.2) (emphasis added) The complaint alleges that the termination date was July 20, 2018, sixty days after written notice was given on May 21, 2018. (D.I. 2 at ¶¶ 96-98) The Agreement and SOW do not provide for immediate termination upon notice or for VoterLabs to immediately cease spending fees or incurring costs. (D.I. 11,

7

Ex. A at § 8.2; Ex. B) Moreover, although the operative termination date is July 20, 2018, Ethos argues that VoterLabs has not pleaded that it incurred any fees or costs after May 21, 2018, the date that VoterLabs mailed its notice of termination.[7] (D.I. 11 at 10) However, VoterLabs has pleaded that, after May 21, 2018, it continued to work on software and custom-built tools to be delivered with the software, while also compiling documents, work product, and other materials for Ethos, as required under the Agreement. (D.I. 2 at ¶¶ 98, 107, 110) Moreover, Ethos' notice of termination stated:

> We hereby notify you that we have elected, pursuant to Section 8.2 of the Agreement, to terminate the Agreement and the related Statement of Work Number 1, sixty (60) days from the date of this notice. In accordance with this election, we respectfully request that you *immediately cease all services as of the date of this letter*. Further, in accordance with Section 8.4 we resepectfully ask for you to return all our of [*sic*] property, equipment, Confidential Information, and permanently erase all Confidential Information from your computer systems.

(D.I. 2 at ¶ 95) (emphasis in original) Viewing the well-pleaded factual allegations in a light most favorable to plaintiff, the fifth Engagement Payment was due before the effective date of termination and defendant's termination instructions expressly demanded further wrap-up work. This is sufficient to plausibly assert a claim for the fifth Engagement Payment and create an issue for factual determination as to VoterLabs' resulting damages, if any.

Furthermore, Ethos avers that the Engagement Payments were paid ninety days in advance and, therefore, VoterLabs cannot establish damages. (D.I. 11 at 9-10; D.I. 15 at 4) Ethos argues that VoterLabs can only claim damages if it incurred costs in the development of Feature Groups or was unable to cover the costs of wrapping up the project between June 7,

---

[7] Ethos argues that even if VoterLabs has pleaded continued work after May 21, 2018, it would need to plead that it spent all of the funds from the fourth Engagement Payment. (D.I. 15 at 6 n.8) No such requirement was pleaded in the complaint or mentioned in the Agreement or the SOW. (D.I. 2; D.I. 11, Ex. A; Ex. B)

8

2018, the alleged due date for the fifth Engagement Payment, and July 20, 2018, the termination date. (D.I. 11 at 9-10)  Moreover, Ethos argues that section 6(b)(viii) of the SOW required VoterLabs to refund fees for services or products not provided. (*Id.*)  VoterLabs contends that the Engagement Payments are not fees to be refunded under section 6(b)(viii). (D.I. 14 at 13-15 & n.12)  Ethos counters that if Engagement Payments are not fees, VoterLabs cannot recover for the fifth Engagement Payment. (D.I. 15 at 4-6)  Ethos notes that, under the Agreement, the exclusive remedy for "[Ethos'] payment breach shall be [VoterLabs'] right to damages equal to its earned but unpaid *fees*." (*Id.*; D.I. 11, Ex. A at § 11.3) (emphasis added)  VoterLabs avers that section 6(b)(viii) of the SOW refers to "Usage Fees" and the use of the word "fees" in section 11.3 of the Agreement encompasses Engagement Payments if a payment is contractually required but not made. (D.I. 19 at 3)  "Fee" is not a term defined in the Agreement or the SOW.[8] (*See* D.I. 11, Ex. A; Ex. B)

VoterLabs seeks recovery of $195,450, the amount due for the fifth Engagement Provision under section 4(d) of the SOW. (D.I. 11, Ex. B at § 4(d)).  Ethos' argument on the merits of VoterLabs' damages is not properly before the court.  On a motion to dismiss, the court assumes all well-pleaded facts to be true and only tests the sufficiency of the pleadings. *See Umland*, 542 F.3d at 64.  Under the Rule 12 analysis, the court views the damages allegations in the complaint and the contract documents which are incorporated by reference in favor of VoterLabs. *See Church of Universal Bhd. v. Farmington Twp. Supervisors*, 296 F App'x 285, 288 (3d Cir. 2008); *Gould Elec., Inc. v. U.S.*, 220 F.3d 169, 176 (3d Cir. 2000).  Ethos cites *Raymark* to assert that termination of a contract with notice, makes it "impossible" to continue

---

[8] Ethos attaches the Project Overview to its reply brief, which is incorporated by reference in the complaint. Ethos argues that the Project Overview confirms that the Engagement Payments are fees, but it makes no mention of either Engagement Payments or fees. (D.I. 15, Ex. A)

performance and leaves only the possibility of a *quantum meruit* claim. (D.I. 15 at 6) *Raymark* is inapposite because the court addressed the termination of an agreement between a client and attorney. *See Raymark Industries, Inc. v. Butera, Beausang, Cohen & Brennan*, 1997 WL 746125, at \*17 (E.D. Pa. Dec. 1, 1997) ("A client may terminate his relation with an attorney at any time, notwithstanding a contract for fees, but if he does so, thus making performance of the contract impossible, the attorney is not deprived of his right to recover on a quantum meruit a proper amount for the services which he has rendered.").

To state a breach of contract claim, a plaintiff must demonstrate the existence of a contract, the breach of an obligation imposed by that contract, and resultant damage to plaintiff. *See Weyerhaeuser Company v. Domtar Corporation*, 61 F. Supp. 3d 445, 453 (D. Del. 2014). The complaint avers that the first and second Engagement Payments were paid on June 12, 2017 and September 14, 2017, respectively. (D.I. 2 at ¶¶ 29-30, 44) The complaint alleges that pursuant to the SOW, Ethos was thereafter obligated to make payments on "December 9, 2017 (Engagement Payment No. 3), March 9, 2018 (Engagement Payment No. 4), June 7, 2018 (Engagement Payment No. 5), and September 5, 2018 (Engagement Payment No. 6)." (*Id.* at ¶ 45) The complaint avers that the fifth Engagement Payment was not conditional[9] and the Agreement was still in effect until July 20, 2018 such that Ethos was still required to make the payment that became due on June 7, 2018.[10] (*Id.* at ¶¶ 45, 95-97; D.I. 11, Ex. A at § 8.2) The

---

[9] VoterLabs alleges that while the seventh and eighth Engagement Payments were conditional, the fifth Engagement Payment was not. (D.I. 14 at 8 & n.5) The SOW states that the seventh and eighth Engagement Payments "will only be for any necessary outstanding development, integration, or optimization to deliver final Deliverables." (D.I. 11, Ex. B at § 4(d))
[10] Ethos has previously argued that the complaint and the SOW state that the fifth Engagement Payment's due date should be calculated by counting ninety days from April 26, 2018, the date that the fourth Engagement Payment was made. (D.I. 14 at 9) The complaint alleges that Engagement Payments are due ninety days after receipt of the previous payment, and provides an excerpt of the table of Engagement Payments in SOW § 4(d). (D.I. 2 at ¶ 43) The complaint

complaint alleges that, following Ethos' termination, Ethos asked VoterLabs to re-engineer its software and deliver it to Ethos. (D.I. 2 at ¶ 107) VoterLabs alleges that it informed Ethos that it would be ready for delivery as planned. (*Id.* at ¶ 110) The complaint alleges that VoterLabs "complied in all material respects with its obligations under the [Agreement]." (*Id.* at ¶ 125) The complaint avers that, to date, Ethos has failed to make the fifth Engagement Payment. (*Id.* at ¶¶ 121, 126) Furthermore, section 6(b)(viii) of the SOW states: "[i]f, exercising its rights under process, [Ethos] elects to terminate, [VoterLabs] shall refund to [Ethos] any fees for services or products that have not been provided under this SOW (except as otherwise set forth herein)." (D.I. 11, Ex. B at § 6(b)(viii)) Thus, factual issues remain as to what proportion of the fifth Engagement Payment, if any, should be deemed "unused."

Therefore, VoterLabs has plausibly pleaded a claim for breach of contract with respect to the fifth Engagement Payment and the court recommends denying Ethos' motion to dismiss Count I.

### b. Count II – Breach of Contract for Termination Payment

Ethos argues that Count II should be dismissed because the termination payment outlined in section 4(a) of the SOW would only be due after all three Feature Groups were completed, but this condition precedent was never satisfied.[11] (D.I. 11 at 11-13) Ethos contends that the Agreement's definition of "Base Royalty" includes the requirement of completing all three

---

also alleges specific deadlines based on the payment dates for the first and second Engagement Payments. (*Id.* at ¶¶ 44-45) To the extent that Ethos maintains this argument, the court notes that this dispute of fact as to the proper due date for the fifth Engagement Payment is not properly before the court. At this stage in the proceedings, the well-pleaded facts are taken as true and viewed in the light most favorable to the plaintiff.

[11] Ethos argues that, under VoterLabs' interpretation of calculating the termination payment, it would suffer a two million dollar windfall while VoterLabs failed to produce any of the three Feature Groups. (D.I. 11 at 11 n.7)

Feature Groups before making the Termination Payment. (*Id.* at 13) On the other hand, VoterLabs contends that Ethos overlooks a portion of section 4(a) which provides that a part of the royalty may become payable "[d]uring development and prior to completion of all three Feature Groups." (D.I. 14 at 16; D.I. 11, Ex. B at § 4(a)) Ethos' arguments raising factual disputes with the complaint, and arguments on the merits of VoterLabs' breach of contract claim with respect to the termination payment are misplaced at the motion to dismiss stage, where the court assumes all well-pleaded facts are true.

> The complaint recites a portion of section 4(a) of the SOW:
>
> Except as mutually agreed upon by the parties, upon termination of the Agreement or this SOW for any reason, [Ethos] shall pay to [VoterLabs], during the Base Royalty Term, 1% of the Base Royalty for each full month that has elapsed between the SOW Effective Date and the date of termination.

(D.I. 2 at ¶ 55; D.I. 11, Ex. B at § 4(a)) Furthermore, the complaint alleges that "[t]he precise meaning and purpose of the termination payment language in [SOW] § 4(a) is not immediately apparent." (D.I. 2 at ¶ 57) Plaintiff suggests that parole evidence may be necessary to bring clarity to any ambiguities in this provision. Consequently, the complaint and plaintiff's answering brief discuss the forthright negotiator principal at length.[12] (D.I. 2 at ¶¶ 58-68; D.I. 14 at 17-18 & n.16) At this stage in the proceedings, the court cannot decide factual disputes as to the merits of this argument, but shall accept all well-pleaded facts as true in analyzing whether VoterLabs has adequately pleaded a claim for breach of contract. The complaint alleges that

---

[12] Under Delaware law, "the forthright negotiator principle provides that, in cases where the extrinsic evidence does not lead to a single, commonly held understanding of a contract's meaning, a court may consider the subjective understanding of one party that has been objectively manifested and is known or should be known by the other party." *VICI Racing, LLC v. T-Mobile USA, Inc.*, 921 F. Supp. 2d 317, 330 (D. Del. 2013) (quoting *United Rentals, Inc. v. RAM Holdings, Inc.*, 937 A.2d 810, 836 (Del. Ch. 2007)). *See also Sodano v. American Stock Exchange LLC*, 2008 WL 2738583, at *12 n.69 (Del. Ch. July 15, 2008).

"Base Royalty" is defined as "a royalty of (a) one dollar ($1.00) per Vehicle sold by or through a Monthly User ("Monthly Royalty") or (b) two hundred and fifty thousand dollars ($250,000) per year ("Yearly Minimum Royalty"), whichever is greater." (D.I. 2 at ¶ 49) The complaint defines the Base Royalty Term as "a period of ninety-nine (99) years from the SOW Effective Date," where the SOW Effective Date is October 23, 2017. (*Id.* at ¶¶ 50-51) Ethos' termination of the Agreement was effective on July 20, 2018. (*Id.* at ¶¶ 95-98) Plaintiff alleges that, to date, Ethos has failed to make the termination payment as required under the Agreement.[13] (*Id.* at ¶¶ 122, 128) Therefore, plaintiff has plausibly pleaded a claim for breach of contract with respect to the termination payment and the court recommends denying Ethos' motion to dismiss Count II.

### c. Count III – Malicious Conduct in Aid of an Oppressive Scheme

Ethos argues that Count III should be dismissed because VoterLabs has not alleged a breach of contract, damages, or willful and malicious action by Ethos. (D.I. 11 at 13-14) The parties cite *Ripsom*, which contemplates punitive damages for "willful or malicious breaches of contract." *Ripsom v. Beaver Blacktop*, 1988 WL 32071, at *16 (Del. Super. Ct. Apr. 6, 1988). The parties suggest that, according to *Ripsom*, a plaintiff must allege that "the defendant acted maliciously and without probably [*sic*] cause for the purpose of injuring the other party by depriving him of the benefits of the contract" in order to state a claim for malicious breach of contract. *Ripsom*, 1988 WL 32071, at *18. However, the complaint labels Count III "Malicious Conduct in Aid of an Oppressive Scheme," and no such cause of action exists. (D.I. 2 at ¶¶ 129-

---

[13] The complaint avers that the termination payment is calculated from the SOW effective date, October 23, 2017, through the date of termination, July 20, 2018, a period of eight full months. (D.I. 2 at ¶¶ 50-51, 55, 97) The expected royalty is $24,500,000. (*Id.* at ¶ 52) Citing section 4(a) of the SOW, plaintiff seeks a termination payment that equals 8% of the expected royalty, $1,960,000. (*Id.* at ¶¶ 1, 52, 55; *see also* D.I. 11 at 11 n.7)

13

130)  Plaintiff's answering brief does not provide much more clarity for this cause of action, as plaintiff characterizes Count III as "an intentional tort for [Ethos'] scheme of withholding Engagement Payment No. 5 without probable cause and with the express intention of forcing VoterLabs to give up its contractual and property rights in return for nothing." (D.I. 14 at 18) Plaintiff contends that this is an "uncommon tort," but fails to cite any legal authority that recognizes a claim for "malicious conduct in aid of an oppressive scheme." Instead, plaintiff cites *Ripsom*, which discusses willful and malicious breach of contract. (*Id.* at 19) Unlike the plaintiff in *Good*, plaintiff has not pleaded any factual allegations of defendant's willful or malicious conduct. *See Good v. Moyer*, 2012 WL 4857367, at *7 (Del. Super. Ct. Oct. 10, 2012). However, "[p]unitive damages are potentially available but require complete factual development." *Id.* Therefore, the court recommends granting defendant's motion to dismiss Count III without prejudice.

## V.    CONCLUSION

For the foregoing reasons, the court recommends granting-in-part and denying-in-part defendant's motion to dismiss.[14]  (C.A. No. 19-524, D.I. 10)

Given that the court has relied upon material that technically remains under seal, the court is releasing this Report and Recommendation under seal, pending review by the parties. In the unlikely event that the parties believe that certain material in this Report and Recommendation should be redacted, the parties shall jointly submit a proposed redacted version by no later than October 23, 2019, for review by the court, along with a motion supported by a declaration that includes a clear, factually detailed explanation as to why disclosure of any

---

[14] The court further recommends that, given the nature of the claims in dispute, an early alternative dispute resolution process, such as mediation, may benefit all parties.

proposed redacted material would "work a clearly defined and serious injury to the party seeking closure." *See In re Avandia Mktg., Sales Practices & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (quoting *Miller v. Ind. Hosp.*, 16 F.3d 549, 551 (3d Cir. 1994) (internal quotation marks omitted)). If the parties do not file a proposed redacted version and corresponding motion, or if the court determines the motion lacks a meritorious basis, the documents will be unsealed within thirty (30) days of the date the Report and Recommendation issued.

This Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1. The parties may serve and file specific written objections within fourteen (14) days after being served with a copy of this Report and Recommendation. Fed. R. Civ. P. 72(b)(2). The objection and responses to the objections are limited to ten (10) pages each. The failure of a party to object to legal conclusions may result in the loss of the right to de novo review in the District Court. *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v. Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R. Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website, http://www.ded.uscourts.gov.

Dated: October 16, 2019

Sherry R. Fallon
United States Magistrate Judge