**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| VOTERLABS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 19-524-RGA-SRF |
| | ) | |
| ETHOS GROUP CONSULTING | ) | |
| SERVICES, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

### I.  INTRODUCTION

Presently before the court in this breach of contract action are a partial[1] motion to dismiss for failure to state a claim pursuant to Federal Rule of Civil Procedure 12(b)(6) and a motion for leave to file a first amended counterclaim pursuant to Federal Rules of Civil Procedure 15(a)(2) and 16(b)(4) and Local Rule 15.1, filed by defendant, Ethos Group Consulting Services, LLC ("Ethos").[2]  (D.I. 59; D.I. 59)  For the following reasons, I recommend that the court DENY Ethos' motion to dismiss, and GRANT Ethos' motion for leave to file a first amended counterclaim.[3]

---

[1] Ethos moves to dismiss only Count III of the amended complaint, alleging a malicious breach of contract claim.  (D.I. 52; D.I. 59)

[2] The court addresses the motion to dismiss by Report and Recommendation pursuant to Fed. R. Civ. P. 72(b) and the motion for leave to file a first amended counterclaim by Memorandum Order pursuant to Fed. R. Civ. P. 72(a).

[3] The briefing for Ethos' motion to dismiss is as follows: Ethos' opening brief (D.I. 60), VoterLabs' answering brief (D.I. 63), and Ethos' reply brief (D.I. 66).  The briefing for Ethos' motion to file an amended counterclaim is as follows: Ethos' motion and opening brief (D.I. 68), VoterLabs' answering brief (D.I. 75), and Ethos' reply brief (D.I. 81).

## II. BACKGROUND

### a. Procedural History

On March 15, 2019, plaintiff VoterLabs, Inc. ("VoterLabs") initiated this action by filing a complaint (the "original complaint") against Ethos, alleging two counts of breach of contract for failing to remit an engagement payment and a termination payment and one count of malicious conduct in aid of an oppressive scheme.  (D.I. 2 at ¶¶ 123–30)  On April 8, 2019, Ethos filed a motion to dismiss VoterLabs' original complaint for failure to state a claim.  (D.I. 10)  On November 18, 2019, the court granted-in-part and denied-in-part Ethos' motion.  (D.I. 22; D.I. 27)  The court granted Ethos' motion with respect to VoterLabs' claim of malicious conduct in aid of an oppressive scheme and dismissed the claim without prejudice.  *VoterLabs, Inc. v. Ethos Grp. Consulting Servs., LLC*, C.A. No. 19-524-RGA, 2019 WL 6120449, at *7 (D. Del. Oct. 16, 2019), *report and recommendation adopted*, 2019 WL 6118014 (D. Del. Nov. 18, 2019).  The court denied Ethos' motion with respect to VoterLabs' two breach of contract claims.  *Id.* at *4–7.

On December 2, 2019, Ethos filed an answer to VoterLabs' original complaint, asserting affirmative defenses and a counterclaim for breach of contract.  (D.I. 28)  VoterLabs filed an amended complaint on April 27, 2020.  (D.I. 52)  The amended complaint alleges two breach of contract claims and a malicious breach of contract claim.  (*Id.* at ¶¶ 154–61)  On May 7, 2020, Ethos filed the partial motion to dismiss with prejudice the malicious breach of contract claim in the amended complaint. (D.I. 59)

On June 8, 2020, Ethos filed a motion for leave to file a first amended counterclaim, alleging fraud and negligent misrepresentation.  (D.I. 68 at 1 n.1)  On July 16, 2020, the court entered an oral order granting-in-part Ethos' motion for continuance of the trial date, discovery

deadlines, and pre-trial deadlines (D.I. 49), finding that good cause existed to amend the

scheduling order (D.I. 32) due to the current health emergency.  The parties were ordered to meet

and confer on a joint proposed amended scheduling order due on or before July 24, 2020.  The

court granted the joint proposed amended scheduling order on August 17, 2020, which extended

the discovery deadlines but not the original deadline to amend pleadings.  (D.I. 90)

      **b.  Facts[4]**

           **i.  VoterLabs' Amended Complaint**

On December 18, 2017, VoterLabs and Ethos executed a Services Agreement ("the

Services Agreement") and a Statement of Work ("the SOW"), according to which VoterLabs

was to develop software for Ethos.[5]  (D.I. 52 at ¶ 38)  The Services Agreement contained the

following relevant language:

> 10.3   Limitation of Liability.  Except for Violations of [VoterLabs']
> indemnification obligations described in Section 10.1 with respect to willful
> misconduct, in no event shall [VoterLabs'] or [Ethos'] liability, whether based in
> contract, tort, negligence, strict liability or otherwise, with respect to this
> Agreement, the Services, and other similar services, exceed the available
> proceeds of such insurance policies as may be required to be maintained by
> [VoterLabs] hereunder.  Additionally, in no event shall: (a) [VoterLabs] be liable
> to [Ethos] for special, indirect, incidental or consequential damages, or any
> damages arising from the loss of use, data or profits, whether based in contract,
> tort, negligence, strict liability or otherwise, even if [VoterLabs] knew of the
> possibility thereof; and (b) [Ethos] be liable to [VoterLabs] for special, indirect,
> incidental or consequential damages, or any damages arising from the loss of
> use, data or profits, whether based in contract, tort, negligence, strict liability or
> otherwise, even if [Ethos] knew of the possibility thereof.

---

[4] The facts in this section are based upon allegations in VoterLabs' amended complaint, which
the court accepts as true for the purposes of the pending motion to dismiss.  *See Umland v.
Planco Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).  In its earlier Report and
Recommendation, the court detailed the relevant background facts of this case, which have not
substantially changed, and which are hereby incorporated.  *See VoterLabs, Inc. v. Ethos Grp.
Consulting Servs., LLC*, C.A. No. 19-524-RGA, 2019 WL 6120449, at *1–4 (D. Del. Oct. 16,
2019), *report and recommendation adopted*, 2019 WL 6118014 (D. Del. Nov. 18, 2019).
[5] The Services Agreement and the SOW were incorporated by reference in the complaint.  (D.I.
52; D.I. 60, Ex. A & Ex. B)

. . .

> 11.3   Except for a breach of Section 7, all rights and remedies provided in this Agreement are cumulative and not exclusive, and the exercise by either Party of any right or remedy does not preclude the exercise of any other rights or remedies that may now or subsequently be available at law, in equity, by statute, in any other agreement between the Parties, or otherwise.  Despite the previous sentence, the Parties intend that [VoterLabs'] exclusive remedy for [Ethos'] payment breach shall be its rights to damages equal to its earned but unpaid fees.

(D.I. 60, Ex. A at §§ 10.3, 11.3)  The parties also agreed to an "Engagement Payment" schedule, whereby Ethos would pay VoterLabs fixed payments in 90-day intervals.  (*Id.* at ¶¶ 42–46)  On or about March 9, 2018, Engagement Payment No. 4, for $228,700, became due.  (*Id.* at ¶ 75) Ethos remitted Engagement Payment No. 4 on April 26, 2018, over a month late.  (*Id.* at ¶¶ 89– 90)

On May 21, 2018, Ethos delivered a notice of termination of the Services Agreement via email and overnight mail to VoterLabs.  (*Id.* at ¶ 96)  The notice of termination cited, *inter alia*, § 8.2 of the Services Agreement, which allowed Ethos to terminate the Services Agreement without cause sixty days after providing notice—July 20, 2020, in this case.   (*Id.* at ¶¶ 97–98)

On May 30, 2018, representatives of the parties met to discuss the next steps.  (*Id.* at ¶¶ 102–05)  VoterLabs pointed out that Engagement Payment No. 5 would become payable before the July 20, 2020 termination date and that Ethos' termination without cause triggered Ethos' obligation to make a termination payment to VoterLabs.  (*Id.* at ¶ 104)  On June 7, 2018, Engagement Payment No. 5 became payable in the amount of $195,450.  (*Id.* at ¶ 111)  Ethos refused to make Engagement Payment No. 5 based on the following rationale: Under the Engagement Payment schedule, Engagement Payment No. 5 became due 90 days after VoterLabs' receipt of Engagement Payment No. 4.  Ethos paid Engagement Payment No. 4 on April 26, 2018.  As a result, Engagement Payment No. 5 became payable on July 25, 2018,

4

which is 90 days after April 26, 2018 and after the effective termination date of July 20, 2018.

Therefore, Ethos had no obligation to make Engagement Payment No. 5 because it became due

after the effective termination date.  (*Id.* at ¶¶ 134–49)  VoterLabs alleges that Ethos devised this

rationale, withholding Engagement Payment No. 5 as leverage to (1) procure a release from its

obligation to make a termination payment and (2) obtain complete ownership of VoterLabs'

intellectual property rights in the software developed pursuant to the Services Agreement and

SOW up until the termination.  (*Id.* at ¶ 130)

### i.     Ethos' First Amended Counterclaim[6]

As the parties negotiated the Services Agreement and SOW, VoterLabs represented in a

"Project Overview" to Ethos that it intended use a revenue model based on licensing payments

rather than markups on the cost of development.  (D.I. 68-1 at ¶ 23)  Although VoterLabs

represented that it would develop software for Ethos "at cost," VoterLabs planned to generate

revenue by charging Ethos more than the cost of paying software developers.  (*Id.* at ¶¶ 25, 37)

In addition, despite promising to "hibernate"—refrain from pursuing other projects while

developing software for Ethos—VoterLabs used money it received from Ethos pursuant to the

Services Agreement and SOW to pay a data scientist to work on projects for other customers.

(*Id.* at ¶¶ 48–51)  On November 1, 2018, months after Ethos had terminated the agreement

between the parties, VoterLabs provided Ethos the work product it had developed pursuant to the

Services Agreement and SOW—software called "NeosInsight."  (D.I. 68-1 at ¶¶ 7–8)  On

---

[6] This facts in this section are based on the allegations in Ethos' proposed first amended counterclaims, which the court accepts as true for the purposes of the pending motion for leave to amend.  *See Winer Family Trust v. Queen*, 503 F.3d 319, 331 (3d Cir. 2007); *Wright v. City of Wilmington*, C.A. No. 13-1966-SLR-SRF, 2016 WL 356023, at *2 n.3, *8 (D. Del. Jan. 28, 2016).  All paragraph citations to the proposed first amended counterclaim at D.I. 68-1 refer to the numbered paragraphs beginning on page 23 under the heading, "Counterclaim."

January 6, 2019, someone then-unknown to Ethos[7] reserved a website for "Axilient." (*Id.* at ¶ 9)
On October 6, 2019, VoterLabs announced the launch of Axilient, an "artificial intelligence
[and] machine learning solution," which "mark[ed] the culmination of several years of stealth
development." (*Id.* at ¶ 10)

### III.   LEGAL STANDARDS

#### a.   Federal Rule of Civil Procedure 12(b)(6)

Rule 12(b)(6) permits a party to move to dismiss a complaint for failure to state a claim
upon which relief can be granted. *See* Fed. R. Civ. P. 12(b)(6). When considering a Rule
12(b)(6) motion to dismiss, the court must accept as true all well pleaded factual allegations in
the complaint and construe all reasonable inferences in favor of the plaintiff. *See Umland v.
Planco Fin. Servs. Inc.*, 542 F.3d 59, 64 (3d Cir. 2008).

To state a claim upon which relief can be granted pursuant to Rule 12(b)(6), a complaint
must contain a "short and plain statement of the claim showing that the pleader is entitled to
relief." Fed. R. Civ. P. 8(a)(2). Although detailed factual allegations are not required, the
complaint must set forth sufficient factual matter, accepted as true, to "state a claim to relief that
is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); s*ee also Ashcroft
v. Iqbal*, 556 U.S. 662, 663 (2009). A claim is facially plausible when the factual allegations
allow the court to draw the reasonable inference that the defendant is liable for the misconduct
alleged. *See Iqbal*, 556 U.S. at 663; *Twombly*, 550 U.S. at 555-56.

The court's determination is not whether the non-moving party "will ultimately prevail,"
but whether that party is "entitled to offer evidence to support the claims." *United States ex rel.
Wilkins v. United Health Grp., Inc.*, 659 F.3d 295, 302 (3d Cir. 2011). This "does not impose a

---

[7] VoterLabs acknowledges that it registered the Axilient name in January 2019. (D.I. 75 at 6)

probability requirement at the pleading stage," but instead "simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of [the necessary element]." *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quoting *Twombly*, 550 U.S. at 556). The court's analysis is a context-specific task requiring the court "to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

### b. Federal Rules of Civil Procedure 15 and 16

Rule 15(a)(2) of the Federal Rules of Civil Procedure provides that after a responsive pleading has been filed, a party may amend its pleading "only with the opposing party's written consent or the court's leave," and "[t]he court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). The decision to grant or deny leave to amend lies within the discretion of the court. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *In re Burlington Coat Factory Secs. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997). The Third Circuit has adopted a liberal approach to the amendment of pleadings. *See Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990). In the absence of undue delay, bad faith, or dilatory motives on the part of the moving party, the amendment should be freely granted, unless it is futile or unfairly prejudicial to the non-moving party. *See Foman*, 371 U.S. at 182; *In re Burlington*, 114 F.3d at 1434.

If a party seeks leave to amend after a deadline imposed by the scheduling order, the court must apply Rule 16 of the Federal Rules of Civil Procedure. *See WebXchange Inc. v. Dell Inc.*, C.A. No.08-132-JJF, 2010 WL 256547, at *2 (D. Del. Jan. 20, 2010). A court-ordered schedule "may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). "The good cause element requires the movant to demonstrate that, despite diligence, the proposed claims could not have been reasonably sought in a timely manner." *Venetec Int'l, Inc. v. Nexus Med., LLC*, 541 F. Supp. 2d 612, 618 (D. Del. 2008). The focus of the "good

cause" inquiry is, therefore, on diligence of the moving party, rather than on prejudice, futility, bad faith, or any of the other Rule 15 factors. *See Glaxosmithkline LLC v. Glenmark Pharms. Inc.*, C.A. No. 14-877-LPS-CJB, 2016 WL 7319670, at *1 (D. Del. Dec. 15, 2016). Only after having found the requisite showing of good cause will the court consider whether the proposed amended pleading meets the Rule 15(a) standard. *See E. Minerals & Chems. Co. v. Mahan*, 225 F.3d 330, 340 (3d Cir. 2000).

## IV.    DISCUSSION

### a.    Partial motion to dismiss under Rule 12(b)(6)

#### i.    Well pleaded factual allegations

Ethos argues that the court should dismiss VoterLabs' malicious breach of contract claim because VoterLabs failed to plead Ethos' willful or malicious conduct. (D.I. 60 at 5, 9–12) Both parties cite *Ripsom v. Beaver Blacktop, Inc.*, 1988 WL 32071 (Del. Super. Ct. Apr. 26, 1988), *aff'd* 567 A.2d 418 (Del. 1989) to articulate the contours of malicious breach of contract. (D.I. 60 at 9–12; D.I. 63 at 6–10; D.I. 66 at 2) *Ripsom* provides a standard that a plaintiff must meet to recover punitive damages in a breach of contract action. *See id.* at *18. "[T]o recover punitive damages in a breach of contract action, the plaintiff must show that the defendant acted maliciously and without probabl[e] cause for the purpose of injuring the other party by depriving him of the benefits of the contract." *Id.*; *see also Gillenardo v. Connor Broad. Del. Co.*, 2002 WL 991110, at *11 (Del. Super. Ct. Apr. 30, 2002) (articulating the proper legal standard for a punitive damage award in a breach of contract action).

In the original complaint, VoterLabs styled Count III as an intentional tort claim for "Malicious Conduct in Aid of an Oppressive Scheme." (D.I. 2 at ¶¶ 129–30) The court dismissed the claim because "no such cause of action exists" and because the original complaint

did not contain "any factual allegations of [Ethos'] willful or malicious conduct." *VoterLabs*,
2019 WL 6120449, at *7, *report and recommendation adopted*, 2019 WL 6118014.  Count III of
the amended complaint is restyled "Malicious Breach of Contract."  (D.I. 52 at ¶¶ 160–61)
Unlike the original complaint, the amended complaint at Count III contains approximately fifty
paragraphs of detailed factual allegations, which are incorporated by reference, (D.I. 52 at ¶¶
107–53), describing the way in which Ethos "acted maliciously and without probabl[e] cause for
the purpose of injuring [VoterLabs] by depriving [it] of the benefits of the contract." [8]  *Ripsom*,
1988 WL 32071, at *18.

In relevant part, the amended complaint alleges that on May 21, 2018, Ethos delivered a
notice of termination to VoterLabs, and, under § 8.2 of the Services Agreement, the parties'
contract formally terminated on July 20, 2020.  (*Id.* at ¶¶ 96–98)  Between the notice of
termination date and actual termination date, Engagement Payment No. 5 became due on June 7,
2018.  (*Id.* at ¶ 111)  On May 30, 2018, an Ethos employee met with VoterLabs' CEO to request
that, by the end of June 2018, VoterLabs reconfigure the software developed for Ethos such that
it would be a standalone product, no longer reliant on VoterLabs' data inputs.  (*Id.* at ¶¶ 107–08)
In the subsequent weeks, VoterLabs repeatedly requested Ethos' position on Engagement
Payment No. 5.  (*Id.* at ¶¶ 109–13)  The due date for Engagement Payment No. 5 eventually
passed, but Ethos did not make any payment or make any other offer to pay VoterLabs.  (*Id.* at ¶
111)  On June 25, 2018, VoterLabs delivered the standalone code Ethos had requested.  (*Id.* at ¶

---

[8] Delaware courts recognize "prudential limitations" with respect to punitive damage awards for
breach of contract.  *Ripsom v. Beaver Blacktop, Inc.*, 1988 WL 32071, at *17 (Del. Super. Ct.
Apr. 26, 1988) (quoting *Reiver v. Murdoch & Walsh, P.A.*, 625 F. Supp. 998, 1015 (D. Del.
1985)).  Punitive damages are not available: (1) "for breach[es] of contract involving mere
negligence," (2) "when the breaching party reasonably believes that a meritorious defense exists
for its non-performance," or (3) "when a breach of contract, though intentional, is not similar in
character to an intentional tort."  *See id.*

113)  On or about June 25, 2018, Ethos told VoterLabs' CEO that it would not accept the standalone software because of Ethos' "change in focus."  (*Id.* at ¶ 115)  The parties began discussing the termination payment due to VoterLabs and reviewed the negotiation history of the termination payment provision.  (*Id.* at ¶¶ 117–20)

On July 13, 2018, the parties held a telephone call to discuss their status.  (*Id.* at ¶¶ 118, 131–32)  Around that same time, Ethos proposed a "Release Agreement" and a "Patent License." (*Id.* at ¶ 126)  Under Ethos' proposal, VoterLabs would release all past, present, and future claims against Ethos and grant Ethos a perpetual, irrevocable, and royalty-free license to use VoterLabs' patents.  (*Id.*)  In exchange, VoterLabs would receive one payment of $200,000, roughly the same amount Ethos was already obligated to pay VoterLabs for Engagement Payment No. 5.  (*Id.* at ¶¶ 126, 131)

The amended complaint further alleges that when VoterLabs disagreed with Ethos' position on the call, Ethos proffered a meritless rationale for withholding Engagement Payment No. 5 as follows: Under the Engagement Payment schedule, Engagement Payment No. 5 became due 90 days after VoterLabs' receipt of Engagement Payment No. 4.  Ethos paid Engagement Payment No. 4 on April 26, 2018, which was over a month late.  As a result, Engagement Payment No. 5 became payable on July 25, 2018, which is 90 days after April 26, 2018, and after the effective termination date of July 20, 2018.  Therefore, Ethos argued, it had no obligation to make Engagement Payment No. 5 because the payment became due after the effective termination date.  (*Id*. at ¶¶ 134–49)  Ethos repeated this rationale in a meeting between the parties on August 22, 2018.  (*Id*. at ¶¶ 141–44)

Despite knowing this rationale was legally meritless and a pretext to exploit VoterLabs' vulnerable position, Ethos never gave an alternative basis for withholding Engagement Payment

10

No. 5.  (*Id.* at ¶¶ 137–38, 150)  The amended complaint alleges that Ethos withheld Engagement Payment No. 5 for a "phony reason" as leverage to force VoterLabs to (1) release Ethos from the termination payment obligation, a lawful benefit of the contract due to VoterLabs, and (2) grant Ethos a free license to use VoterLabs' intellectual property.  (*Id.* at ¶¶ 121–26)  The amended complaint specifically states that Ethos knew withholding Engagement Payment No. 5 placed VoterLabs' survival in jeopardy.  (*Id.* at ¶¶ 110, 123)  Accepted as true, these allegations state that Ethos "acted maliciously and without probabl[e] cause" to exploit VoterLabs' vulnerable position "for the purpose of injuring" VoterLabs by "depriving [it] of the benefits of the contract."  *See Ripsom*, 1988 WL 32071, at *18.

Ethos argues the allegations describing Ethos' malice relate to events that occurred after Ethos provided notice of termination on May 21, 2018, and after June 7, 2018, when VoterLabs contends Engagement Payment No. 5 was due.  (D.I. 60 at 10–11)  On May 25, 2018, in reference to upcoming negotiations with VoterLabs, Ethos employees exchanged an email that said "I'll be ready" next to a picture of a character from the television show The Walking Dead who is shown holding a baseball bat over his shoulder.  (D.I. 52 at ¶¶ 129–30)  Although the email was sent soon after Ethos provided the notice of termination, the email was sent before Engagement Payment No. 5 became due and while the parties were still discussing the termination payment.  (*Id.* at ¶¶ 96–129)  Construing all reasonable inferences in VoterLabs' favor, which the court must do at the pleading stage, the email demonstrates Ethos' "ill-will, hatred or intent to cause injury" to VoterLabs.  *See Ripsom*, 1988 WL 32071, at *16; *see also Umland*, 542 F.3d at 64.

Ethos' arguments challenge the facts underlying the allegations in the amended complaint, which is not appropriate on a motion to dismiss.  *See Umland*, 542 F.3d at 64.  Ethos

argues the factual allegations in the amended complaint "do not rise to the level of malice." (D.I. 60 at 10)  For example, Ethos characterizes its communication that a termination would be forthcoming unless VoterLabs agreed to amend their contract as a "common sense" attempt to "[s]top[] the economic bleeding," not malice. (D.I. 66 at 3)  Ethos also argues the factual allegations related to malicious breach in the amended complaint are "all conclusory." (D.I. 60 at 10)  Ethos' argument fails because the amended complaint pleads factual allegations sufficient to state a cause of action for malicious breach of contract. (D.I. 52 at ¶¶ 107–53)

### ii. Contractual limitation on damages

Ethos further argues that the court should dismiss VoterLabs' malicious breach of contract claim because the agreements at issue bar VoterLabs from recovering punitive damages. (D.I. 60 at 12–14)  Section 11.3 of the Services Agreement states that "[VoterLabs'] exclusive remedy for [Ethos'] payment breach shall be its rights to damages equal to its earned but unpaid fees," which, Ethos argues, prevents VoterLabs from recovering punitive damages resulting from Ethos' alleged payment breach. (D.I. 60 at 12–13; D.I. 60, Ex. A at § 11.3)  In addition, Ethos cites § 10.3 of the Services Agreement, a limitation of liability clause, which states that Ethos cannot be liable to VoterLabs for "special, indirect, incidental or consequential damages, or any damages arising from the loss of use, data or profits, whether based in contract, tort, negligence, strict liability or otherwise, even if [Ethos] knew of the possibility thereof." (D.I. 60 at 13; D.I. 60, Ex. A at § 10.3)  In response, VoterLabs argues § 10.3 and § 11.3 cannot be enforced against a claim for malicious breach of contract because such a claim is "akin to an intentional tort." (D.I. 63 at 10–13)  VoterLabs argues Ethos' interpretation of the Services Agreement is unenforceable as a matter of public policy. (*Id.* at 12)

At the pleadings stage, the court cannot determine the nature and extent of damages allegedly recoverable under the contract. *See Winfield v. Eloxx Pharms., Inc.*, C.A. No. 19-447-RGA, 2020 WL 1333008, at *1 (D. Del. Mar. 23, 2020) ("[I]ssues of contract interpretation raised by Defendants cannot be resolved against Plaintiff on a motion to dismiss."). Factual disputes exist regarding the parties' interpretation of contractual provisions relating to damages. *See Universal American Corp. v. Partners Healthcare Sols. Holdings, L.P.*, C.A. No. 13-1741-RGA, 61 F.Supp.3d 391, 400 (D. Del. 2014) ("[Q]uestions involv[ing] disputed issues of fact and contract interpretation [are] not suitable to resolution on a motion to dismiss."). The pleadings are sufficient to allege a malicious breach of contract. Whether the contract bars punitive damages is not before the court. Moreover, several of the authorities Ethos relies on relate to post-trial rulings, not the sufficiency of a pleading. *See, e.g.*, *Enzo Life Scis., Inc. v. Adipogen Corp.*, C.A. No. 11-088-RGA, 82 F. Supp. 3d 568, 606–07 (D. Del. 2015) (declining to award punitive damages for breach of contract based the court's findings of fact after a four-day bench trial); *eCommerce Indus., Inc. v. MWA Intelligence, Inc.*, 2013 WL 5621678, at *1 (Del. Ch. Sept. 30, 2013) (describing "*post-trial* findings of fact and conclusions of law") (emphasis added). Therefore, the court recommends denying Ethos' partial motion to dismiss.

### b.  Motion for leave to file an amended counterclaim under Rules 15 & 16

Ethos moves to amend its counterclaim for breach of the contract for software development. (D.I. 68) The motion was filed on June 8, 2020, after the April 27, 2020 deadline for amending pleadings. (*Cf.* D.I. 32 at ¶ 2; D.I. 68; D.I. 90 at ¶ 14) Ethos did not seek an extension of the deadline for amendment of the pleadings, despite its motion for continuance of other deadlines in the case schedule, which was granted by the court. (D.I. 49; 07/16/20 Oral Order; D.I. 90)

The proposed amendment seeks to add two counts based upon fraud and/or fraudulent inducement and negligent misrepresentation, in addition to the original counterclaim based upon breach of contract.  (D.I. 68-1 at ¶¶ 101–15)  The amended counts detail an alleged fraud perpetrated by VoterLabs to secure a software development contract with Ethos so that VoterLabs would have the means to fund its own project known as "Axilient" instead of developing the software, known as "NeosInsight" for Ethos' business.  (*Id.* at ¶¶ 5–11)  Neither the Services Agreement nor the SOW allowed VoterLabs to use money it received from Ethos for projects other than Ethos' projects.  (*Id.* at ¶ 72)  Nevertheless, the amended counterclaim alleges VoterLabs did not dedicate a team to work on Ethos' project and siphoned Ethos' money away for other projects.  (*Id.* at ¶¶ 72–73)

### i.  Good Cause

The amendment is necessitated by discovery that Ethos argues was not produced by VoterLabs until after deadlines in the case schedule expired for amending pleadings and conducting fact discovery.  (D.I. 32; D.I. 68)  Ethos highlights that it was "misled" by VoterLabs prior to commencement of the litigation and continuing afterwards when it was stymied in its efforts to obtain the correct code repository for the source code representing VoterLabs' work product on Ethos' software.  (D.I. 68 at 2)  Namely, on November 1, 2018, VoterLabs provided Ethos with a hard drive (the "November Hard Drive") and represented that it contained the work product on Ethos' software.  (*Id.* at 3)  On Feb 21, 2020, Ethos served written discovery requests on VoterLabs requesting, *inter alia*, information on how the hard drive was created.  (*Id.* at 3–4)  Importantly, Ethos wanted to access the metadata to confirm its suspicions about when and how VoterLabs created the November Hard Drive to allegedly conceal the deficiencies in its work on the Ethos project.  (*Id.* at 4)   On April 16, 2020, VoterLabs finally agreed to produce the

"GitHub"[9] repository so that Ethos' expert, Isaac Pflaum ("Mr. Pflaum"), could review the source code in native format. (*Id.*) The delay allegedly necessitated the extension of discovery deadlines in the case schedule, but no action was taken to extend the deadline for amendment of pleadings, which expired on April 27, 2020. (*Id.*)

Ethos submitted Mr. Pflaum's declaration in support of and at the same time as its motion for leave to amend. (D.I. 68, Ex. D) Mr. Pflaum declared that he received access to a GitHub repository from VoterLabs on May 1, 2020. (*Id.* at ¶ 20) However, Mr. Pflaum averred that the GitHub repository produced did not include the code on the November Hard Drive. (*Id.* at ¶¶ 20–24) Mr. Pflaum confirmed that "VoterLabs has not produced the repository wherein the code in the November Hard Drive was created and undoubtedly altered." (*Id.* at ¶ 21) Mr. Pflaum opined that "VoterLabs created a separate repository at some unknown time in which to manipulate the code provided on the November Hard Drive." (*Id.* at ¶ 22) According to VoterLabs, Ethos had not shared Mr. Pflaum's declaration with VoterLabs before filing the motion for leave to amend. (D.I. 75 at 2) On June 18, 2020, Ethos submitted a letter to the court with a supplemental declaration by Mr. Pflaum. (D.I. 69) Mr. Pflaum's supplemental declaration admits that he "was able to locate a version of the GitHub Code that matches the code on the November Hard Drive . . . by reviewing emails produced by VoterLabs in this litigation, performing a detailed review of the GitHub Code metadata, and performing multiple comparisons of versions of the GitHub Code to the code on the November Hard Drive." (D.I. 69, Ex. A at ¶ 5) Mr. Pflaum's supplemental declaration also indicates that he was aided in discovering the matching code by discussing the matter with a VoterLabs representative on June 12, 2020. (*Id.* at ¶ 7) Mr. Pflaum's supplemental declaration claims that the manner in which

---

[9] GitHub is a "popular version control system used to track and store code." (D.I. 75 at 2)

VoterLabs' produced the GitHub repository "unnecessarily delayed and complicated an otherwise simple exercise of identifying the delivered code in the [GitHub] repository." (*Id.* at ¶ 15) VoterLabs disagreed with Mr. Pflaum's initial declaration and continues to dispute the revised assertions in Mr. Pflaum's supplemental declaration. (D.I. 75 at 2)

Between May 8, 2020 and May 19, 2020, VoterLabs produced approximately 6,900 documents to Ethos. (D.I. 68 at 5) From that production, Mr. Pflaum located an email that suggested a reference to source code that did not exist in the GitHub repository. (D.I. 68 at 5) Fact discovery closed on June 1, 2020. (*Id.*; D.I. 32 at ¶ 3(a)) On June 15, 2020, VoterLabs produced a thumb drive with the code Mr. Pflaum considered missing from earlier productions, an apparent discovery dispute that was seemingly resolved when the parties' respective experts met and conferred after this motion was filed. (D.I. 69 at 2; D.I. 69, Ex. A at ¶ 19) Ethos also argues that VoterLabs withheld production of messages on "Slack" containing its internal communications during development of the software. (D.I. 68 at 6–7) In summary, Ethos argues that VoterLabs' discovery deficiencies made it "needlessly difficult" for Ethos' to access source code in a native format accurately reflecting VoterLabs' development of the code purportedly captured by its previously produced "crawling tools." (D.I. 69 at 1; D.I. 68 at 7)

In its answering brief (D.I. 75), however, VoterLabs failed to address the standard for good cause.[10] *See vMedex, Inc. v. TDS Operating, Inc.*, C.A. No. 18-1662-MN, 2020 WL 4925512, at *7 (D. Del. Aug. 21, 2020) (failure to raise an argument in an answering brief results in waiver of that argument). Good cause exists for Ethos to amend its counterclaim to add counts based upon fraud and negligent misrepresentation because it promptly sought leave to file

---

[10] The failure to address good cause demonstrates to the court that the instant dispute would have benefitted from a more effective met and confer process.

an amended pleading after discovering the facts which form the basis of the claims it seeks to

pursue. *See BigBand Networks, Inc. v. Imagine Commc'ns, Inc.*, C.A. No. 07-351-JJF, 2010 WL

2898286, at *2 (D. Del. July 20, 2010) (granting leave to amend where the defendant had filed

its motion for leave within weeks of learning the information it sought to add to its pleadings).

Having found good cause exists for Ethos to amend its counterclaim, the court considers

whether the motion for leave to amend satisfies the requirements of Rule 15. *See Mahan*, 225

F.3d at 340.

### ii.  Undue Delay and Prejudice

Ethos argues that granting its motion for leave to amend will not result in undue delay or

prejudice because Ethos' additional claims involve discovery that has already occurred and

information VoterLabs has possessed since this litigation began.  (D.I. 68 at 10–12)  In response,

VoterLabs argues Ethos' motion for leave to amend amounts to one of many of the dilatory

litigation tactics Ethos has used to increase VoterLabs' costs.  (D.I. 75 at 14–15)

Prejudice to the non-moving party occurs when "allowing the amended pleading would

(1) require the non-moving party to expend significant additional resources to conduct discovery

and prepare for trial, (2) significantly delay the resolution of the dispute, or (3) prevent [a party]

from bringing a timely action in another jurisdiction." *Intellectual Ventures I LLC v. Toshiba

Corp.*, C.A. No. 13-453-SLR, 2016 WL 4690384, at *1 (D. Del. Sept. 7, 2016) (quoting *Long v.

Wilson*, 393 F.3d 390, 400 (3d Cir. 2004)).  Delay alone is an insufficient reason to deny leave to

amend; delay must be coupled with undue prejudice to the non-moving party resulting from

granting a motion for leave to amend. *See Cureton v. Nat'l Collegiate Athletic Ass'n*, 252 F.3d

267, 273 (3d Cir. 2001) (citing *Cornell & Co., Inc. v. Occupational Safety & Health Review

Comm'n.*, 573 F.2d 820, 823 (3d Cir.1978)).  To show undue prejudice, a non-moving party must

17

demonstrate that it will be "unfairly disadvantaged or deprived of the opportunity to present facts or evidence" if leave to amend is granted. *Bechtel v. Robinson*, 886 F.2d 644, 652 (3d Cir. 1989) (internal quotations and citations omitted).

VoterLabs fails to demonstrate that it will be "unfairly disadvantaged or deprived of the opportunity to present facts or evidence" if leave to amend is granted. *Id.* Since Ethos filed its motion for leave to amend, the scheduling order has been amended, and the discovery cut off date is now November 13, 2020. (D.I. 90 at ¶ 3(a)) Ethos avers, and VoterLabs does not dispute, that no depositions had occurred before Ethos' filed its motion for leave to amend. (D.I. 68 at 11) Therefore, allowing Ethos' amendment will not "result in *additional* discovery, cost, and preparation to defend against new facts or new theories." *See Cureton*, 252 F.3d at 273 (emphasis added).

### iii.   Futility[11]

Futility is the only basis upon which VoterLabs opposes Ethos' motion for leave to amend. (D.I. 75 at 3–14) The standard for assessing futility of amendment under Fed. R. Civ. P. 15(a) is the same standard of legal sufficiency applicable under Fed. R. Civ. P. 12(b)(6). *Shane v. Fauver*, 213 F.3d 113, 115 (3d Cir.2000). Specifically, the amended pleading must fail to state a claim upon which relief could be granted even after the district court "tak[es] all pleaded

---

[11] As VoterLabs notes, Ethos' proposed amended counterclaim states that "Ethos Consulting received and relied upon these representations in the State of Texas, and Ethos Consulting's harm was felt in the State of Texas." (D.I. 68-1 at ¶ 102 n.27) VoterLabs argues Delaware law applies despite Ethos' allegation that it had relied upon and felt the harm of VoterLabs' representations in Texas because the Services Agreement contains a Delaware choice of law provision. (D.I. 75 at 6) In its reply brief, Ethos does not dispute that Delaware law applies or affirmatively argue that Texas law applies. (D.I. 81) In addition, § 21 of the Services Agreement states: "This Agreement . . . and all matters arising out of or relating to this Agreement, whether sounding in contract, tort, or statute are governed by, and construed in accordance with, the laws of the State of Delaware." (D.I. 60, Ex. A at § 21) However, choice of law disputes, if any, are not ripe for decision by the court on this motion.

allegations as true and view[s] them in a light most favorable to the plaintiff."  *Winer Family Trust v. Queen*, 503 F.3d 319, 331 (3d Cir.2007); *see also Great W. Mining & Mineral Co. v. Fox Rothschild LLP*, 615 F.3d 159, 175 (3d Cir.2010).

### 1.  Anti-reliance clause in the NDA[12]

VoterLabs argues Ethos' proposed amendment is futile because an anti-reliance clause in the Confidentiality and Non-Disclosure Agreement (the "NDA"), which was incorporated into the Services Agreement at issue in this litigation, bars Ethos' fraud and negligent misrepresentation claims.  (D.I. 75 at 6–12)  In response, Ethos argues that the Services Agreement does not incorporate the NDA and, in the alternative, that even if incorporated into the Services Agreement, the NDA does not bar the proposed amended counterclaims.  (D.I. 81 at 5–8)  This is a purely factual dispute regarding contract interpretation.  *See Winfield*, 2020 WL 1333008, at *1 ("[I]ssues of contract interpretation raised by Defendants cannot be resolved against Plaintiff on a motion to dismiss."); *Universal American*, 61 F.Supp.3d at 400 ("[Q]uestions involv[ing] disputed issues of fact and contract interpretation [are] not suitable to resolution on a motion to dismiss.").  The well pleaded amended counterclaim is accepted as true.  *See Winer Family Trust*, 503 F.3d at 331.  Whether Ethos will prevail on its claims upon its interpretation of the various agreements remains to be litigated.  VoterLabs' challenge to the proposed amended counterclaim's factual averments and its interpretation of the anti-reliance provision contained in an earlier Confidentiality and Non-Disclosure Agreement, which

---

[12] The anti-reliance clause in the NDA states: "Each Party further agrees that it is not entitled to rely on the accuracy or completeness of the Confidential Information, and that it will only be entitled to rely on such representations and warranties as may be included in any definitive agreement with respect to any prospective business transaction, arrangement, and/or relationship, subject to such limitations and restrictions as may be contained therein."  (D.I. 76, Ex. A at ¶ 1)

preceded the Services Agreement and SOW that are the subject of this breach of contract dispute, are inappropriate arguments on a motion to dismiss. *See Winfield*, 2020 WL 1333008, at *1; *Universal American*, 61 F.Supp.3d at 400.

### 2.  Alleged Bootstrapping

VoterLabs also argues Ethos impermissibly "bootstrapped" fraud and negligent misrepresentation counterclaims to a breach of contract counterclaim and failed to allege distinct damages resulting from VoterLabs' fraud and negligent misrepresentation.  (D.I. 75 at 12–14) Delaware law does "not permit a plaintiff to 'bootstrap' a breach of contract claim into a tort claim merely by intoning the *prima facie* elements of the tort while telling the story of the defendant's failure to perform under the contract." *Cornell Glasgow LLC v. La Grange Props. LLC*, 2012 WL 2106945, at *8 (Del. Super. Ct. June 6, 2012) (emphasis in original) (internal citations omitted).  "To be viable, the tort claim must involve violation of a duty which arises by operation of law and not by the mere agreement of the parties." *Id.* (internal quotations and citations omitted). "[T]o successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's actions." *Id.* (internal citations omitted). "And the damages allegations may not simply 'rehash' the damages allegedly caused by the breach of contract." *Id.*

However, "the anti-bootstrapping rule does not apply where a plaintiff has made particularized allegations that a seller knew contractual representations were false or lied regarding the contractual representation."[13] *Swipe Acquisition Corp. v. Krauss*, 2020 WL

---

[13] VoterLabs did not cite *Swipe Acquisition Corp. v. Krauss*, 2020 WL 5015863, at *11 (Del. Ch. Aug. 25, 2020) or any other authority stating the multiple ways, aside from the standard set forth in *Cornell Glasgow*, by which a party may allege a cause of action for fraud alongside breach of contract without violating the rule against bootstrapping.  (D.I. 75 at 12–14)  Ethos' reply brief distinguishes *Cornell Glasgow* without presenting more recent authorities, like *Swipe*

5015863, at *11 (Del. Ch. Aug. 25, 2020) (citing *Anschutz Corp. v. Brown Robin Capital, LLC*, 2020 WL 3096744, at *15 (Del. Ch. June 11, 2020)).  "Contractual representations may form the basis for a fraud claim where a plaintiff has alleged facts 'sufficient to support a reasonable inference that the representations were knowingly false.'"  *Id.* (quoting *Prairie Capital III, L.P. v. Double E Holding Corp.*, 132 A.3d 35, 62 (Del. Ch. 2015)).  The amended counterclaim contains several particularized allegations that VoterLabs lied about contractual representations it knew were false.  (D.I. 68-1 at ¶¶ 17–64)  For example, the amended counterclaim alleges that VoterLabs pitched Ethos on the idea that it would develop software for Ethos "at cost."  (*Id.* at ¶ 25)  Despite this representation, VoterLabs charged Ethos $17,500 per month for a senior developer while knowing that a such a developer would cost VoterLabs only $6,000 per month.  (*Id.* at ¶ 25)  Accordingly, Ethos' proposed fraud counterclaim is not impermissibly bootstrapped to its breach of contract counterclaim, and Ethos' amended counterclaims are not futile.  Therefore, Ethos' motion for leave to file an amended counterclaim is granted.

## V.   CONCLUSION

For the foregoing reasons:

(1) The court recommends that Ethos' motion to dismiss Count III of the amended complaint for failure to state a claim pursuant to  Federal Rule of Civil Procedure 12(b)(6) be DENIED (D.I. 59).  This portion of the Report and Recommendation is filed pursuant to 28 U.S.C. § 636(b)(1)(B), Fed. R. Civ. P. 72(b)(1), and D. Del. LR 72.1(a)(3).

---

*Acquisition*, which articulate a more complete statement of the rule against bootstrapping.  (D.I. 81 at 8–9)

(2) Ethos' motion for leave to file a first amended counterclaim pursuant to Federal Rules
of Civil Procedure 15(a)(2) and 16(a)(4) is GRANTED (D.I. 68).  This portion of the
memorandum order is nondispositive and subject to 28 U.S.C. § 636(b)(1)(A), Fed.
R. Civ. P. 72(a), and D. Del. LR 72.1(a)(2).

The parties may serve and file specific written objections within fourteen (14) days after
being served with a copy of this Report and Recommendation.  Fed. R. Civ. P. 72(a)-(b)(2).  The
objection and responses to the objections are limited to ten (10) pages each. The failure of a party
to object to legal conclusions may result in the loss of the right to de novo review in the District
Court.  *See Sincavage v. Barnhart*, 171 F. App'x 924, 925 n.1 (3d Cir. 2006); *Henderson v.
Carlson*, 812 F.2d 874, 878–79 (3d Cir. 1987).

The parties are directed to the court's Standing Order For Objections Filed Under Fed. R.
Civ. P. 72, dated October 9, 2013, a copy of which is available on the court's website,
http://www.ded.uscourts.gov.

Dated:  October 19, 2020

Sherry R. Fallon
United States Magistrate Judge