## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| VOTERLABS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 19-524-MAK |
| | ) | (Consolidated) |
| v. | ) | |
| | ) | |
| ETHOS GROUP CONSULTING | ) | |
| SERVICES, LLC, ETHOS GROUP, INC., | ) | |
| ETHOS GROUP RESOURCES, INC., ETHOS | ) | |
| GROUP HOLDINGS, INC., AND DAVID | ) | |
| TEREK | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |
| ETHOS GROUP CONSULTING SERVICES, | ) | |
| LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| WALTER KAWECKI, ANDY ATHERTON, | ) | |
| DAMIAN SMITH, AND STEPHEN | ) | |
| CHAPUT, | ) | |
| | ) | |
| Defendants. | | |

## THIRD AMENDED COMPLAINT

Plaintiff, VoterLabs, Inc. ("VoterLabs"), by and through its undersigned counsel, on knowledge as to its own conduct and otherwise upon information and belief, hereby alleges the following against defendants Ethos Group Consulting Services, LLC ("Ethos Consulting"), David Terek ("Terek"), Ethos Group, Inc. ("Ethos Inc."), Ethos Group Resources, Inc. ("Ethos Resources"), and Ethos Group Holdings, Inc. ("Ethos Holdings").

## Nature of the Action

1.    VoterLabs seeks redress for (a) Ethos Consulting's breach of its contractual promise to make a periodic engagement payment to VoterLabs of $195,450; (b) Ethos

Consulting's breach of its contractual promise to make a termination payment upon termination without cause equaling 8% of an expected royalty calculation; and (c) Ethos Group's malicious breach of contract to avoid payment of the second (the termination payment) by delaying and withholding payment of the first (the engagement payment) without probable cause.  VoterLabs has also learned more about the depth and scope of the tortious conduct by "Ethos Consulting" in the course of this litigation, and therefore adds additional claims and parties—alter ego, fraud, and conspiracy, against Terek, Ethos Inc., Ethos Resources, and Ethos Holdings.

## Jurisdiction and Venue

2.     VoterLabs is a Connecticut corporation with its principal place of business in Branford, Connecticut.

3.     Ethos Consulting is a Delaware manager-managed limited liability company with its principal place of business in Irving, Texas.

4.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  VoterLabs is a citizen of Connecticut, and Ethos Consulting, Terek, Ethos Inc., Ethos Resources, and Ethos Holdings are citizens of Delaware and/or Texas for purposes of 28 U.S.C. § 1332, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

5.     This Court also has personal jurisdiction over the parties and is the proper venue.

   a.     Ethos Holdings is a Delaware corporation.

   b.     Ethos Consulting is a Delaware limited liability company, and consented to suit in the United States District Court for the District of Delaware.

   c.     The bases for jurisdiction of the remaining Texas defendants is described further below.  Ethos Consulting is the alter ego of Terek, Ethos Inc., and Ethos Resources and therefore have likewise consented to suit in the United States District Court for the District of Delaware, and indeed have been present throughout this Delaware litigation embodied in the form of Ethos Consulting.  In addition, as to the fraud and alternative conspiracy claims against the Texas defendants, Terek, Ethos Inc., and Ethos

Resources are closely related to the written contract at issue which selected Delaware law and a Delaware forum to resolve all disputes, and have had sufficient minimum contacts with Delaware in connection with the fraud and conspiracy complained of such that the maintenance of suit here does not offend traditional notions of fair play and substantial justice, including (i) not only creating Ethos Consulting, a Delaware entity, but then maintaining and using it in the fraudulent manner against VoterLabs herein described; (ii) supporting the operations of Ethos Consulting and directing it to act on behalf of and to benefit Terek and Ethos Inc. (not only funding and directing Ethos Consulting's entering and performing the written contract at issue but also funding and directing Ethos Consulting's filing of claims against VoterLabs in June 2020 in Delaware arising out of and relating to the written contract at issue); and (iii) forcing litigation in Delaware over an Ethos Consulting engagement payment obligation that Ethos Consulting acknowledged was owed and withheld without probable cause to injure VoterLabs as an integral component to the overall scheme.

## The Original Parties

**A.**    **VoterLabs**

6.    VoterLabs is a small business started in 2012 and majority owned and controlled by Walter Kawecki.  VoterLabs offers data analytics, microtargeting, and custom software for political organizations and medium and enterprise clients that could benefit from using predictive analytics to understand and market to voters and consumers.

**B.**    **Ethos Consulting**

7.    Ethos Consulting is one of a number of related private companies directly or indirectly owned and controlled by Terek that together provides products and services to car dealerships in the United States, as well as sell and profit from vehicle service contracts, extended warranties, GAP insurance, and other finance and insurance ("F&I") products to everyday consumers who purchase or lease cars.  These entities refer to themselves and will be referred hereinafter collectively as "Ethos Group".  Ethos Consulting and the related private companies (*i.e.*, Ethos Group) together employ approximately 300 people and generates hundreds of millions in revenue each year.

3

8.  Ethos Group also has data developed, generated, produced, provided or otherwise sourced by Ethos Group that it wished to use to improve sales, utilizing data analytics, microtargeting, and/or custom software.

**Facts**

A.  **The 2016 NDA and Interim Agreement**

9.  In a Confidentiality and Non-Disclosure Agreement dated and executed on or about May 5, 2016 (hereinafter, the **"2016 NDA"**), VoterLabs and Ethos Consulting (on behalf of itself and its affiliates under common control) agreed to the terms for handling the exchange of confidential information to facilitate a definitive agreement between them.

10. In a Service Agreement and Statement of Work dated December 20, 2016 and executed on or about January 18, 2017 (hereinafter, the **"Interim Agreement"**), VoterLabs agreed to review Ethos Group's data and perform "Data Enrichment and Analysis", generate "Customer Profiles", and perform "Product Opportunity Analysis" in return for $55,000.

11. VoterLabs completed the work under the Interim Agreement and Ethos Group paid the $55,000 as promised.

12. Regarding the "Product Opportunity Analysis", the Interim Agreement stated:

> In performing and delivering the services, VoterLabs will gather information and perform analysis useful to possible future custom or joint product development for or with Ethos Group, such as generation of rudimentary predictive or prescriptive scoring models, or data integration and platform integration analysis.

13. On or about March 28, 2017, VoterLabs emailed Ethos Group a document entitled "Master_Roadmap_March_2017_ETHGRP.pdf" (hereinafter, the **"Roadmap"**), which summarized VoterLabs' ideas resulting from the product opportunity analysis.

14. On or about March 29, 2017, David Terek invited Walter Kawecki to Texas.

4

15.     On or about April 5, 2017, David Terek and Walter Kawecki had dinner, where they discussed the Interim Agreement and potential next steps.

16.     At the dinner, David Terek stated to Walter Kawecki that he wanted to make the relationship between Ethos Group and VoterLabs "permanent".

**B.     The April 6, 2017 Oral Agreement**

17.     On or about April 6, 2017, at an Ethos Group company meeting, David Terek stated during a presentation to a room full of people that he was contemplating an initial public offering, and further stated that VoterLabs was the missing piece to help Ethos Group go from an insurance and financial services business to a tech-oriented business worth exponentially more.

18.     At the same April 6, 2017 meeting, David Terek rejected VoterLabs' previous proposal that the parties adopt a standard proof of concept/pilot program approach typical for custom software development.

19.     At the same April 6, 2017 meeting, David Terek, acting on behalf of Ethos Group, made a counterproposal to Walter Kawecki as follows:

> a.     Ethos Group would pay VoterLabs to work with Ethos Group IT professionals and develop the software at cost;
>
> b.     VoterLabs would own the IP associated with the software and the project (as the features and functionality would be broadly applicable to various use cases and across many industries);
>
> c.     Ethos Group would receive exclusive rights in the automotive sector to use the software and the associated IP; and
>
> d.     Upon completion of the software, Ethos Group would pay VoterLabs $1 per vehicle sold or leased by Ethos Group dealerships using the software in perpetuity as an easy to calculate royalty.

20.     At that time, Ethos Group's client dealerships sold or leased more than 500,000 cars/year.

21.     Walter Kawecki trusted David Terek and, acting on behalf of VoterLabs, orally agreed to the counterproposal (hereinafter, the "**April 6, 2017 Oral Agreement**").

C.     **The Project Overview**

22.     On or about April 24, 2017, VoterLabs emailed Ethos Group a document entitled "VoterLabs - Ethos Group Project Overview" (hereinafter, the **"Project Overview"**).

23.     The Project Overview identified three key software components (a/k/a "Feature Groups") from the Roadmap for VoterLabs to develop.

24.     The Project Overview estimated that it would take about 12 months for the core components of the software to be developed and deployed and an additional 6-12 months for the software to be fully matured (that is, tested and optimized after deployment), for a total of 18-24 months.

25.     The Project Overview also stated:  "During the period of development and deployment, VoterLabs will go into 'hibernation'".

26.     The word "hibernation" referred to VoterLabs ceasing other work and the pursuit of other opportunities to focus exclusively on development of the software with Ethos Group.

27.     The Project Overview also stated:  "VoterLabs revenue model for this venture is based on recurring revenue from licensing, rather than maximizing profit for custom development."

28.     The Project Overview also attached an estimate of the cost to VoterLabs for the first twelve (12) months based on the scope of work and expectations at that time as follows:

     a.    Months 1-3:  $109,700
     b.    Months 4-6:  $142,950
     c.    Months 7-9:  $195,450
     d.    Months 9+:  $228,700

29.     Confirming the April 6, 2017 Oral Agreement of the parties, on or about June 12, 2017, Ethos Group wired VoterLabs $109,700.

30.     Further confirming the April 6, 2017 Oral Agreement of the parties, on or about September 14, 2017, Ethos Group wired VoterLabs $142,950.

**D.      The 2017 Written Agreement**

31.     In addition to working together on development of the software, the parties worked on memorializing the April 6, 2017 Oral Agreement reached between Ethos Group and VoterLabs into a written agreement.

32.     On or about October 22, 2017, VoterLabs' team visited Ethos Group in Texas, to meet and present an update on the development of the software.

33.     At the October 22, 2017 meeting, the parties agreed to renew their previous efforts to memorialize in writing the April 6, 2017 Oral Agreement reached between Ethos Group and VoterLabs.

34.     Negotiations occurred between October 22 and December 18, 2017.

35.     The main negotiators were David Terek and William Surprise, Esq., co-general counsel of Ethos Group, for Ethos Group, and Walter Kawecki and Benjamin Wiles, Esq. of the law firm Updike, Kelley & Spellacy, for VoterLabs.

36.     Attorneys William Surprise and Benjamin Wiles kept a master draft into which the parties inserted edits with changes tracked.

37.     The parties traded numerous drafts between October 23 and December 18, 2017.

38.     On or about December 18, 2017, Ethos Consulting and VoterLabs executed a Service Agreement and Statement of Work dated October 23, 2017 (the "**2017 Written Agreement**").

39.     The 2017 Written Agreement subsumed the April 6, 2017 Oral Agreement.

1.     **Engagement Payments**

40.     In the 2017 Written Agreement, the parties memorialized that VoterLabs would employ an "agile development model".

41.     Agile development is an iterative software development methodology, that allows for changes and adjustments to be made during development to take into account such things as feedback gained from user testing, advances in technology, and changes in the marketplace. Agile development contrasts with the "waterfall" approach, where an extensive plan is set from the start and then followed carefully, leaving little room for flexibility or change.

42.     The payments under the April 6, 2017 Oral Agreement for VoterLabs' performance of agile development work were all changed into and called "Engagement Payments" by Ethos Group in the 2017 Written Agreement.

43.     Specifically, the parties agreed:

Engagement Payments. In the consideration of development of the Feature Groups, Customer will make payments (the "Engagement Payments") as indicated immediately below:

| Payment Number | Condition / Timing | Payment Amount |
|---|---|---|
| 1 | 6/12/2017 | $109,700.00 (both parties agree that this payment was already paid and received on 6/12/17) |
| 2 | 90 Days After Receipt of Payment Number 1 | $142,900 |
| 3 | 90 Days After Receipt of Payment Number 2 | $195,450 |
| 4 | 90 Days After Receipt of Payment Number 3 | $228,700 |
| 5 | 90 Days After Receipt of Payment Number 4 | Between $195,450 and $228,700, final amount TBD |
| 6 | 90 Days After Receipt of Payment Number 5 | Between $195,450 and $228,700, final amount TBD |
| 7 | 90 Days After Receipt of Payment Number 6 | Up to $228,700, final amount TBD (this payment will only be for any necessary outstanding development, integration, or optimization to deliver final Deliverables) |
| 8 | 90 Days After Receipt of Payment Number 7 | Up to $228,700, final amount TBD (this payment will only be for any necessary outstanding development, integration, or optimization to deliver final Deliverables) |

44.    VoterLabs originally proposed that only the first payment be a (non-refundable) engagement payment, and that subsequent payments be based on an accounting of time and costs, but Ethos Group rejected and changed that, removed the accounting of time and costs, and created the periodic 90 day engagement payment approach, so that the price for development would be a fixed priced determined in advance based on an estimate of VoterLabs' cost.

45.    Although the "Engagement Payments" provision stated that only Engagement Payment No. 1 had already been paid, in fact both Engagement Payment Nos. 1 and 2 had already been paid on or about June 12, 2017 and September 14, 2017, respectively.

46.    Pursuant to the "Engagement Payments" provision, so long as the 2017 Written Agreement was in effect, and VoterLabs substantially complied, Ethos Group was contractually

committed to make the identified payments on (or by operation of law, at a reasonable time after) June 12, 2017 (Engagement Payment No. 1), September 10, 2017 (Engagement Payment No. 2), December 9, 2017 (Engagement Payment No. 3), March 9, 2018 (Engagement Payment No. 4), June 7, 2018 (Engagement Payment No. 5), and September 5, 2018 (Engagement Payment No. 6).

47.    As noted above, on or about December 18, 2017, Ethos Consulting and VoterLabs executed the 2017 Written Agreement.

48.    On or about December 22, 2017, Ethos Group wired VoterLabs $195,540—Engagement Payment No. 3 contemplated by the 2017 Written Agreement.

**2.    Termination Payment**

49.    The 2017 Written Agreement provides that VoterLabs shall be entitled to the "Base Royalty" paid during the "Base Royalty Term" upon completion of the software.

50.    "Base Royalty" is defined as: "a royalty of (a) one dollar ($1.00) per Vehicle sold by or through a Monthly User ("Monthly Royalty") or (b) two hundred and fifty thousand dollars ($250,000) per year ("Yearly Minimum Royalty"), whichever is greater".

51.    "Base Royalty Term" is defined as: "a period of ninety-nine (99) years from the SOW Effective Date".

52.    "SOW Effective Date" is defined as: "October 23, 2017".

53.    Accordingly, at the time of execution of the 2017 Written Agreement, the Base Royalty paid during the Base Royalty Term was an amount expected to be a minimum of about $24,500,000 (= $250,000 minimum/year x 98 years).

54.    Given the overall structure and surrounding circumstances of the April 6, 2017 Oral Agreement and the subsequent 2017 Written Agreement—including where development

would take a number of months in which VoterLabs would be in "hibernation" and would not profit until completion and receipt of the royalty—VoterLabs sought (and despite some resistance received) appropriate contractual protection.

55.    Specifically, from the earliest drafts of the 2017 Written Agreement, the parties contemplated Ethos Group having the right to terminate without cause by giving sixty (60) days written notice, coupled with a termination payment by Ethos Group to VoterLabs triggered at various times and calculated in various ways.  The parties traded numerous drafts deleting, inserting, and/or altering in material ways the termination payment language.

56.    In the final executed 2017 Written Agreement, the parties agreed in Service Agreement § 8.2 that Ethos Group could terminate without cause by giving sixty (60) day written notice, and in Statement of Work § 4(a) that:

> Except as mutually agreed upon by the parties, upon termination of the Agreement or this SOW for any reason, Customer [Ethos Group] shall pay to Service Provider [VoterLabs], during the Base Royalty Term, 1% of the Base Royalty for each full month that has elapsed between the SOW Effective Date and the date of termination.

57.    The words used by the parties literally say (paraphrasing for simplicity) that upon termination for any reason, Ethos Group shall pay VoterLabs, during a 99 year period starting October 23, 2017, 1% of $250,000/year minimum or $1/vehicle paid monthly, whichever is greater, for each full month that elapses between October 23, 2017 and the date of termination.

58.    The precise meaning and purpose of the termination payment language in Statement of Work § 4(a) is not immediately apparent.

**3.    <u>Forthright Negotiator Principle</u>**

59.    During negotiations, the parties both used the word "royalty" (lowercase) or similar phrases like "royalty fee" and "royalty payments" to refer to the overall total amount of the Base Royalty (an amount per month or year) paid during the Base Royalty Term (99 years).

11

60.    For example, on or about November 6, 2017, William Surprise wrote: "Termination Fee. Ethos Group respectfully disagrees with the proposed termination fee provision (wherein Ethos Group pays a percentage of the royalty fee based upon time of the agreement). However, Ethos Group would like to propose a modification. Upon termination Ethos Group will pay a one-time fee of $250,000."

61.    On or about November 21, 2017, Walter Kawecki emailed David Terek and William Surprise a draft contract in PDF form with proposed language for terms still subject to negotiation, including proposed termination payment language, along with comments on the meaning and rationale associated with each (the "**2017 Notes**").

62.    Comment 17 on the proposed termination payment language stated as follows:

| | |
|---|---|
| Royalty pertains. Except as mutually agreed by the parties, upon termination of the Agreement or this SOW for any reason, Customer shall pay to Service Provider, during the Base Royalty Term, 1% of the Base Royalty for each full month that has elapsed between the SOW Effective Date and the date of such termination. Customer shall provide, | **Commented [WJK17]:** As agreed to, termination payment = 1% of royalty for each month before license/royalty payments start.<br><br>•This protects VoterLabs in case whoever controls Ethos Group exercise their right to *terminate for any reason* with only 60 days notice.<br><br>•The "Except as mutually agreed "to part means we have the flexibility to figure this out around a table in the unlikely event it were to ever be an issue.<br><br>•Note: 1% starts last month (Oct 1), instead of when the first payment was received a few months back. |

63.    Comment 17 forthrightly conveys VoterLabs' position that, in return for Ethos Group's right to terminate without cause (that is, the "right to terminate for any reason with only 60 days notice") prior to completion of the software (and therefore "before the license/royalty payments start"), Ethos Group must agree to make a one-time "termination payment" (singular) to VoterLabs equal to 1% of the royalty (that is, the overall total amount of the Base Royalty

paid during the Base Royalty Term) contemplated by the agreement, multiplied by the number of months that elapse between the effective date of the agreement and the date of termination.

64.     On or about November 21, 2017, William Surprise for Ethos Group responded to Walter Kawecki's November 21, 2017 email, stating:  "Thank you for sharing the document.  If possible, would you please send us a word version of the attached document."

65.     On or about November 22, 2017, Walter Kawecki replied to William Surprise's November 21, 2017 email by attaching the draft in Word.

66.     On or about November 27, 2017, William Surprise typed the termination payment language proposed by Walter Kawecki into the master draft used to track changes made during the drafting process, making only the following edits:

| Walter Kawecki 11/21/2017 | William Surprise 11/27/2017 |
|---|---|
| Except as mutually agreed by the parties, upon termination of the Agreement or this SOW for any reason, Customer [Ethos] shall pay to Service Provider [VoterLabs], during the Base Royalty Term, 1% of the Base Royalty for each full month that has elapsed between the SOW Effective Date and the date of such termination | Except as mutually agreed **upon** by the parties, upon termination of the Agreement or this SOW for any reason, Customer [Ethos] shall pay to Service Provider [VoterLabs], during the Base Royalty Term, 1% of the Base Royalty for each full month that has elapsed between the SOW Effective Date and the date of ~~such~~ termination |

67.     On or about November 30, 2017, on behalf of Ethos Group, William Surprise emailed Walter Kawecki, attaching the updated master version into which he typed the termination payment language.

68.     Between November 30, 2017 and December 18, 2017, the parties exchanged the master draft back and forth additional times with various substantive changes.  Neither party made any further change to the termination payment language.

69.     On or about December 18, 2017, Ethos Consulting and VoterLabs executed the 2017 Written Agreement with the termination payment provision language proposed by Walter

Kawecki on or about November 21, 2017 as edited by William Surprise on or about November 27, 2017.

**E.**    **Termination Without Cause**

70.    From the beginning, Jeff Thomas led the project from the Ethos Group side, and VoterLabs' engineers and Ethos Group's IT team worked together in an amicable manner, with no complaints regarding VoterLabs' personnel or work product.

71.    Upon information and belief, sometime around December 2017, Ethos Group hired two new executives:  Scarlett Shipp and Don Judice.

72.    Scarlett Shipp formerly served as the President of the Synergy Division of CRIF Lending Solutions, which, among other things, provided consulting and software to companies in the financial services industry and automotive sector.

73.    Don Judice formerly served in various C-level management roles in the automotive sector.

74.    Upon joining, Scarlett Shipp immediately contacted her friends and former colleagues (including at AnalyticsIQ, Inc. ("AIQ")) and sought to put in place a copy-cat arrangement for her and her friends and former colleagues to replicate what VoterLabs and Mr. Thomas were doing.  Indeed, these efforts began (and Mr. Terek was fully aware of them) before the 2017 Written Agreement was executed by the parties on December 18, 2017.

75.    In February 2018 and continuing thereafter, VoterLabs struggled to set up meetings with Ethos Group to advance the project.

76.    On or about March 9, 2018 or at a reasonable time thereafter, when Engagement Payment No. 4 of $228,700 became payable, Ethos Group failed to pay.

77.    Walter Kawecki sent repeated reminders and made inquiries to Ethos Group to determine the reason for the delayed payment.

78.    On or about April 4, 2018, Walter Kawecki received a surprise email from Scarlett Shipp seeking to speak with him about the project.  Prior to this point, as far as VoterLabs knew, Scarlett Shipp had not been involved in any meaningful way in the project.

79.    On or about April 5, 2018, Walter Kawecki spoke with Scarlett Shipp by telephone.

80.    On the April 5, 2018 call, Scarlett Shipp stated that Ethos Group and VoterLabs should "take a pause" on development.

81.    In response, Walter Kawecki explained that VoterLabs agreed to do the work at a fixed price estimating its cost and that pausing development was not an option because it would harm VoterLabs.  Walter Kawecki also emphasized VoterLabs' concerns about the delays from Ethos Group with moving the project forward.

82.    In reply, Scarlett Shipp expressed appreciation for the position of VoterLabs (the idea conveyed was that she was used to being in VoterLabs' position as service provider) and offered herself as someone at Ethos Group who would help VoterLabs move the project forward.

83.    On or about April 6, 2018, the next day, during a regularly scheduled bi-weekly check-in call with Ethos Group's IT team, or near in time to it, a long-time, high-level Ethos Group IT professional conveyed to Walter Kawecki in sum and substance that Scarlett Shipp had unclear motives regarding the project and he did not want VoterLabs to be "ambushed" by her (specifically, that Scarlett Shipp might speak unfairly and/or incorrectly about the project to David Terek).  This Ethos Group employee suggested that so long as Ethos Group IT personnel

15

with knowledge of the project were present in meetings then that should protect the project from whatever Scarlett Shipp's motives might be.

84.    On or about April 10 and 11, 2018, VoterLabs and Ethos Group's teams met in Texas.  Scarlett Shipp and Don Judice attended the meetings in place of David Terek.

85.    During the April 10 and 11, 2018 meetings, Scarlett Shipp through words and conduct expressed support for the project and VoterLabs' work.

86.    After the April 10 and 11 meetings in Texas, Walter Kawecki conveyed to David Terek that he would keep an open mind and work cooperatively with Scarlett Shipp.

87.    Unbeknownst to VoterLabs, Scarlett Shipp had been actively thwarting the VoterLabs' project, including by instructing Ethos IT personnel not to share data with VoterLabs, while also sharing VoterLabs' confidential information with her friends and former colleagues with whom she was working to replace VoterLabs.

88.    On or about April 24, 2018, Scarlett Shipp and Don Judice traveled to New Haven, Connecticut to meet with VoterLabs' team.

89.    At the April 24, 2018 meeting, the parties reaffirmed a previously agreed-to June 2018 deployment date for a key piece of the software, as well as an October 2018 deployment date for additional key features.

90.    At the same April 24, 2018 meeting, Scarlett Shipp stated to Walter Kawecki that Ethos Group needed to own the software and its associated IP.  This new request was contrary to the 2017 Written Agreement.  Nonetheless, in response, Walter Kawecki expressed a willingness to discuss possible amendment of the 2017 Written Agreement to accommodate Scarlett Shipp's new request.

91.     On or about April 26, 2018, Ethos Group wired Engagement Payment No. 4 of $228,700.

92.     Engagement Payment No. 4 was more than a month late.

93.     On May 2, 2018, Scarlett Shipp emailed VoterLabs.  The email stated:

Hello Walter, It was really good to meet with you and the team last week.  Per our conversations, attached is an amendment to the current contract.  After this amendment, we can discuss the modifications for the intellectual property.  The first step is to deliver the first module as is and get it in to the market for testing.  Jeff is identifying 3 stores that use the same CRM.  We want to stop all development until we have an understanding of how this module is going to perform and what if any modifications need to occur.

94.     The amendment attached to Scarlett Shipp's May 2, 2018 email in substance eliminated Ethos Group's obligation to make Engagement Payments, without terminating the 2017 Written Agreement.

95.     At no previous point did anyone discuss such an amendment, including during the April 24, 2018 meeting in Connecticut or at any other time.  In addition, Scarlett Shipp's request to "stop all development", and the reasons why it conflicted with the 2017 Written Agreement and if done would harm VoterLabs, had already been discussed on the April 5, 2018 call between her and Walter Kawecki.

96.     The next day, on or about May 3, 2018, Walter Kawecki called David Terek and indicated that he believed Scarlett Shipp's May 2, 2018 email and proposed amendment was hostile and contrary to the 2017 Written Agreement.  In response, David Terek promised he would look into what was happening and call back.

97.     Unbeknownst to VoterLabs, on May 17, 2018, Ms. Shipp and her friends and former colleagues at AIQ held a meeting with Terek and Ethos IT personnel.  One Ethos IT

personnel observed, during the meeting, "So this is voterlabs so far……"  The next day Ms. Shipp asked Mr. Terek for permission to "cancel" the 2017 Written Agreement.

98.    On May 18, 2018, David Terek finally called Walter Kawecki back and stated that Ethos Group would probably terminate the 2017 Written Agreement.

99.    On May 21, 2018, William Surprise, on behalf of Ethos Group, delivered by email and overnight mail a notice of termination which stated in relevant part (italics in original):

> We hereby notify you that we have elected, pursuant to Section 8.2 of the Agreement, to terminate the Agreement and the related Statement of Work Number 1, sixty (60) days from the date of this notice.  In accordance with this election, we respectfully request that you *immediately cease all services as of the date of this letter*.  Further, in accordance with Section 8.4 we respectfully ask for you to return all our of property, equipment, Confidential Information, and permanently erase all Confidential Information from your computer systems. We would ask, in accordance with Section 8.4(f) that you certify you have completed all requirements of Section 8.4.  Please direct any questions to Scarlett Shipp.

(emphasis in original).

100.    The May 21, 2018 notice of termination cited and relied on § 8.2 of the 2017 Written Agreement, which allowed Ethos Group to terminate without cause by giving sixty (60) days notice.

101.    Sixty (60) days from May 21, 2018 was July 20, 2018.

102.    The May 21, 2018 notice of termination also cited § 8.4 of the 2017 Written Agreement, which among other things provided that VoterLabs had to "[d]eliver to Customer [Ethos Group] all documents, work product, and other materials, whether or not complete, prepared by or on behalf of Service Provider [VoterLabs] in the course of performing the Services for which Customer [Ethos Group] has paid".

103.    Delivering the unfinished software fell within the scope of § 8.4.

104.    Termination, however, ceased Ethos Group's right to the necessary licenses.

105.    On May 30, 2018, Walter Kawecki traveled to Texas to meet with Ethos Group to discuss what was to happen next.

106.    David Terek and Scarlett Shipp attended on behalf of Ethos Group.

107.    In the May 30, 2018 meeting, Walter Kawecki noted that (a) Engagement Payment No. 5 of about $200,000 would be payable before the date of termination and therefore was required to be made and (b) that Ethos Group's termination without cause also triggered a termination payment.

108.    David Terek, on behalf of Ethos Group, stated he would pay the $200,000 engagement payment but responded negatively to Ethos Group's obligation to make a termination payment.

109.    Ostensibly relying upon the "[e]xcept as mutually agreed upon by the parties" exception to the termination payment provision, David Terek instructed Scarlett Shipp to figure out an alternative way forward.

**F.    Ethos Group's Malicious Conduct**

110.    In the May 30, 2018 meeting, after David Terek left, Walter Kawecki and Scarlett Shipp remained to discuss possible ways forward.

111.    Scarlett Shipp requested that VoterLabs re-engineer the software to be a standalone product disconnected from VoterLabs' data engine (*i.e.*, not reliant on VoterLabs' data inputs as was the original plan in the 2017 Written Agreement) and deliver the software in a deployable state but otherwise as is to Ethos Group by the end of June 2018.

112.    Walter Kawecki conveyed to Scarlett Shipp at the May 30, 2018 meeting that, while VoterLabs performed that work, Ethos Group should consider and propose a "non-nominal" amount in addition to the $200,000 engagement payment.

113.    On or about June 6, 2018, consistent with the May 30, 2018 conversation, Walter Kawecki sent Scarlett Shipp an email requesting payment of Engagement Payment No. 5 and, in addition, for Ethos Group to propose a non-nominal amount in consideration of various alternatives including paying a partial royalty.  Kawecki's email notes:  "As I said … we're open to considering anything reasonable you come up with for numbers -- we just want to have a shot at surviving this and preserve our relationship with you all for the future" and "I trust you all to be fair …"

114.    Unbeknownst to VoterLabs, on the same day—June 6, 2018—AIQ presented a proposal for the "AnalyticsIQ/Ethos partnership" requiring Ethos Group to pay approximately $1.75M for the first three years.  The termination payment payable to VoterLabs was $1.96M.

115.    On or about June 7, 2018, the scheduled payable date for Engagement Payment No. 5 of $195,450, Ethos Group failed to pay.

116.    On or about June 11, 2018, Scarlett Shipp forwarded Walter Kawecki's June 6, 2018 email to David Terek with no commentary or explanation.

117.    On or about June 15, 2018, Walter Kawecki inquired about the status of Ethos Group's deliberations.   Scarlett Shipp responded:  "Nothing new to report."

118.    On or about June 25, 2018, Walter Kawecki emailed Scarlett Shipp informing her that the software would be ready for delivery as planned, and seeking to schedule time with Ethos Group's IT staff to walk them through installation and deployment as well as the custom-built tools delivered with the software.  In the same email, Walter Kawecki also inquired as to status of Ethos Group's proposal.

119.    On or about June 25, 2018, Scarlett Shipp, on behalf of Ethos Group, replied to Walter Kawecki, stating:

20

Hello Walter, We are not going to take the in-store software at this time. We will pass on it for the time being. Given the change in focus, we aren't going to deploy. Legal is still working on the draft. They have had several high priority items. William [Surprise] and I [are] working together. He is doing the best he can. They have just been dealing with some crucial items. Sorry for the delay. Let me know if you want to talk.

120.    In this way, Ethos Group indicated it did not want to make any deal to pay a partial royalty or otherwise alter in any way the 2017 Written Agreement.

121.    The next day, on or about June 26, 2018, Walter Kawecki and Scarlett Shipp had a telephone call wherein they spoke about the termination payment provision. Scarlett Shipp stated that Ethos Group would take the position that it did not apply. Walter Kawecki responded that that was not true. The parties planned to have a follow-up call to discuss the termination payment provision under the 2017 Written Agreement.

122.    On June 28, 2018, Scarlett Shipp organized the July 13, 2018 call. She invited herself, William Surprise, and Walter Kawecki.

123.    Upon information and belief, sometime before the July 13, 2018 call, Ethos Group closely reviewed the history of the termination payment provision and discovered the 2017 Notes clearly indicating that, as Walter Kawecki had remembered and believed, the termination payment provision applied if Ethos Group terminated without cause pursuant to Service Agreement § 8.2 during development as a fair price for the services performed.

124.    VoterLabs also located the 2017 Notes and, on July 12, 2018, a day before the call, emailed the 2017 Notes to Scarlett Shipp and William Surprise to inform and remind them, respectively, of the express record of the intended meaning of the termination payment provision in advance of their call the next day.

125.    Ethos Group knew that VoterLabs performed its obligations under the 2017 Written Agreement without any complaint communicated between the two parties; that Ethos

Group owed the engagement payment and a termination payment for VoterLabs' services; and that VoterLabs was in a vulnerable position (for example, but not limitation, VoterLabs had recently hired new junior developer employees) and would have little ability to protect its rights.

126.    Ethos Group formed an unlawful plan to withhold Engagement Payment No. 5 for a phony reason and condition the Engagement Payment on VoterLabs' releasing Ethos Group from the termination payment obligation.

127.    Ethos Group knew that withholding the promised Engagement Payment would put at risk VoterLabs' survival and cause it significant harm, and that VoterLabs had arranged its affairs on the assumption that Ethos Group would honor its indisputable contractual commitment.

128.    Upon information and belief, David Terek, unknown to VoterLabs (and in fact led to believe his character and company to be opposite to this unknown history), formerly served as the president of an entity that engaged in deliberate, willful, and bad faith scheme of abusive conduct in connection with its contracts.  Specifically, when asked to pay contractual obligations as promised, systematically took positions to withhold payment without determining whether it had good cause to do so -- and if opposed, engaged in unreasonable conduct while aggressively forming and asserting ex post facto justifications for its failure to pay -- the purpose of which was not for any valid or lawful reason but rather merely as an unlawful tactic to avoid paying what it promised to its vulnerable contractual counterparty.  David Terek knew that doing such a thing to others was and remains wrongful and against the law.

129.    Notwithstanding the foregoing, on or about July 13, 2018, Scarlett Shipp, on behalf of Ethos Group, emailed Walter Kawecki a "Release Agreement" and a "Patent License".

130.    The July 13, 2018 email's proposed "Release Agreement" and "Patent License" together called for a release of all past, present, and future claims known or unknown against all the defendants (which would have included a release from the termination payment obligation) and the grant by VoterLabs to Ethos Group of a perpetual, irrevocable, worldwide, royalty-free license to VoterLabs' patents.  In return, Ethos Group would pay VoterLabs a total of $200,000, roughly the amount Ethos Group was already obligated to pay under the 2017 Written Agreement.

131.    At all points in time prior to hiring outside counsel in connection with this litigation, Ethos Group knew and accepted that, if the 2017 Written Agreement was in effect on a date on which an engagement payment became payable, Ethos Group was contractually required to make the payment.  Indeed, Ethos Group was the party that proposed this "Engagement Payment" approach as a way to limit and cap its costs.

132.    Scarlett Shipp's July 13, 2018 email makes no mention of Engagement Payment No. 5, nor any intention not to pay, nor any proposed reason why Ethos Group might not be obligated to pay, nor any conditions to its complying with its engagement payment obligation under the 2017 Written Agreement.

133.    Scarlett Shipp's July 13, 2020 email also copies Don Judice, who had not been scheduled to attend the call.  However, Don Judice had previously offered his assistance in negotiations with Walter Kawecki.  The following is Don Judice's exact May 25, 2018 email message offer to help Ethos Group's "negotiations", sent right *after* Ethos Group's decision to terminate without cause the 2017 Written Agreement:

| From: | Don Judice [/O=EXCHANGELABS/OU=EXCHANGE ADMINISTRATIVE GROUP (FYDIBOHF23SPDLT)/CN=RECIPIENTS/CN=BA03D8BDE1DE4CB58B67C74FEF781A94-DJUDICE] |
|---|---|
| Sent: | 5/25/2018 1:40:49 PM |
| To: | Scarlett Shipp [SShipp@ethosgroup.com] |
| Subject: | RE: VL |

I'll be ready...



134.     Upon information and belief, Scarlett Shipp and/or David Terek, or both, requested Don Judice's help to execute on a plan to withhold Engagement Payment No. 5 for a pretextual reason and to condition its obligated engagement payment on VoterLabs' (a) releasing any claim to a termination payment, and (b) obtaining a patent license, which they planned to spring on VoterLabs without warning on the July 13, 2018 call.

135.     On or about July 13, 2018, the same day, Walter Kawecki called Ethos Group to discuss Scarlett Shipp's email.  Benjamin Wiles joined for VoterLabs.  Scarlett Shipp, Don Judice, and William Surprise joined for Ethos Group.  Walter Kawecki asked to confirm Ethos Group was proposing $200,000 for the release and patent license in addition to the $200,000 already owed for the engagement payment.  Scarlett Shipp (and Don Judice more forcefully, as suggested in his May 25, 2018 email message offer to assist Scarlett Shipp) stated in sum and substance:  No, one payment of $200,000 was all VoterLabs would receive.

136.     On the July 13, 2018 call, Walter Kawecki explained that the $200,000 was for Engagement Payment No. 5, which everyone agreed was already owed, and asked in substance why Ethos Group thought it could withhold an amount already owed to obtain a release and patent license.

137.    Again, at all times (prior to hiring litigation counsel), Ethos Group understood the Engagement Payment provision to operate as alleged in Paragraph 46 above, namely, if the 2017 Written Agreement was in effect on the date an engagement payment became payable, Ethos Group was contractually required to make the identified engagement payment.

138.    In response to Walter Kawecki's question on the July 13, 2018 call, William Surprise stated that Engagement Payment No. 5 is arguably not required because Engagement Payment No. 5 is not payable until "90 Days After Receipt of Payment Number 4", and Engagement Payment No. 4 was paid/received on April 26, 2018 (over a month late). Consequently, he argued that the 2017 Written Agreement does not require Engagement Payment No. 5 to be made until 90 days after April 26, 2018, which is July 25, 2018.  Thus, he reasoned, because that date is after the termination date, July 20, 2018, Engagement Payment No. 5 is arguably not required.

139.    Ethos Group (both Scarlett Shipp and William Surprise) knew that Engagement Payment No. 4 was delayed and not timely paid, in breach of the 2017 Written Agreement.

140.    Ethos Group (both Scarlett Shipp and William Surprise) knew that its asserted rationale was patently meritless because it would have to be premised on the indefensible and absurd notion that Ethos Group's first breach of the 2017 Written Agreement (paying Engagement Payment No. 4 well over a month late) could authorize Ethos Group to engage in subsequent breaches.  Ethos Group knew it could not unilaterally extend the time for payment of an engagement payment in this way.  Ethos Group knew then, and knows now, that no lawful authority supports such an absurd self-serving proposition, and that the 2017 Written Agreement (in boilerplate language in Service Agreement § 17) express rejects such a proposition.

141.     No other reason was given on the July 13, 2018 call for withholding Engagement Payment No. 5.

142.     Ethos Group (both Scarlett Shipp and William Surprise) knew that the above meritless "argument" for withholding Engagement Payment No. 5 (namely, when a contractually bound party is late with one payment, that same party is contractually permitted to be late with every subsequent payment) was mere pretext to harm Ethos Group's vulnerable contract counterparty, VoterLabs.

143.     Neither Scarlett Shipp nor William Surprise put the above reason for withholding Engagement Payment No. 5 in writing.  Instead, as described above, they devised an email and writing (a release for $100,000 and patent license for $100,000, together totaling $200,000) designed to obscure and hide what they were doing.

144.     The parties July 13, 2018 call ended without resolution.

145.     The parties set up a follow-up call on August 22, 2018 to discuss the issues further.

146.     On the August 22, 2018 call, Ethos Group (Scarlett Shipp and William Surprise) restated and reasserted their position that Engagement Payment No. 5 was in dispute for the same reason (which they again refused to discuss) and that if VoterLabs wanted to receive the payment then it had to release Ethos Group from the termination payment provision.

147.     No new or other reason was given on the August 22, 2018 call for withholding Engagement Payment No. 5.

148.     The parties call ended again without resolution.

149.    Ethos Group, including William Surprise in particular, claims to have no specific recollection as to whether he asserted the above reason for withholding Engagement Payment No. 5 on the July 13, 2018 call.

150.    Ethos Group has also refused or otherwise avoided answering whether it reasserted the above reason for withholding Engagement Payment No. 5 or conditioned its payment on a release of the termination payment provision on either the July 13, 2018 call or the August 22, 2018 call.

151.    Certain other of Ethos Group's representatives, however, upon being formally informed of VoterLabs' claim for payment of Engagement Payment No. 5, perhaps inadvertently, put the same meritless rationale in writing:

> With regards to Payment Number 5 ($195,450.00) ("Payment No. 5"), VoterLabs incorrectly asserts it was payable on June 7, 2018. There is no basis for this particular date precisely because Section 4(d) of the SOW clearly states Payment No. 5 is due 90 days after receipt of Engagement Payment Number 4 … Engagement Payment Number 4 was issued on April 26, 2018. … Assuming a termination date of either May 21, 2018 [the date of the notice] or July 20, 2018 [the termination effective date 60 days later], Payment No. 5 is not due and owing under the Agreement or SOW.

152.    The foregoing relies on the same meritless rationale that William Surprise expressed in the July 13 and August 22, 2018 telephone calls.

153.    When these same Ethos Group representatives learned that Engagement Payment No. 4 was in fact paid well over a month late, and that this fact leads to the correct conclusion that Engagement Payment No. 5 was indisputably required, Ethos Group never again asserted this rationale for non-payment of Engagement Payment No. 5.

154.    Upon information and belief, as reflected above, Ethos Group made a conscious decision to delay and continue to withhold Engagement Payment No. 5 in breach of its contractual obligation, for a reason it knew had no merit, with the aim of hurting VoterLabs, so

that VoterLabs would be in an even more vulnerable position than it already was, and more susceptible to Ethos Group's unlawful demand for a release from an obligation to make the termination payment contemplated by Statement of Work § 4(a) contractually required in return for services already rendered by VoterLabs.

155.    The 2017 Written Agreement expressly permitted Ethos Group to change its mind and terminate without cause, which it did.  However, the 2017 Written Agreement did not permit Ethos Group to also change its mind about paying as promised for the services received, and the law specifically abhors the manner in which Ethos Group went about attempting to do so.

156.    To date, Ethos Group has failed to make the Engagement Payment No. 5.

157.    To date, Ethos Group has failed to make the termination payment.

## ADDITIONAL CLAIMS AND PARTIES

158.    During the course of this litigation, in addition to working to overcome Ethos Group's attrition tactics in order to discover why Ethos Group elected to terminate the 2017 Written Agreement without cause,[1] and confirming that it had nothing to do with any supposed failure by VoterLabs to perform first introduced *ex post facto* by Ethos Group's litigation counsel, VoterLabs has also learned that it has been the latest target and victim of a sophisticated scheme by Terek, using Delaware entities, to obtain services without paying the contractual price for services rendered.

159.    Specifically, in addition to the malicious breach described above, Terek and Ethos Group made intentional misrepresentations to induce VoterLabs to perform development at an extremely low development price.  More specifically, as described below, Terek and Ethos

---

[1]    *See* Paragraphs 74, 87, 97, and 114 above.

Group never intended to pay the royalty (upon completion) or the termination payment (upon termination without cause during development).

A.     **Identification of the Fraudulent Misrepresentations**

160.     The 2017 Written Agreement provides:

> "For the Services to be performed hereunder, the Customer [Ethos Consulting] will pay to Service Provider [VoterLabs] a fee determined in accordance with the fee set forth in each Statement of Work."

Services Agreement § 5.1.

161.     The 2017 Written Agreement, in Services Agreement § 8.3(b), also provides that Ethos Consulting's "inability to pay its debts generally as they become due" is a breach that strikes at and defeats the very essence of the 2017 Written Agreement.

162.     The Statement of Work, in SOW § 4, sets forth the fee for the services.  Relevant here:

> a.     In SOW § 4(d), Ethos Consulting is required to make the engagement payments during development.  The engagement payments are between approximately $1.5 million over a two year period.  This is a very low price for the development of enterprise software and machine learning/AI analytics and, as described above, even though the written contract itself does not mention it, the amounts of the engagement payments were based on VoterLabs' estimate as to the cost without expectation of profit.

> b.     In SOW § 4(a), in the scenario where the software is completed, Ethos Consulting must pay a royalty of $1/vehicle (or $250,000/year) whichever is greater for 99 years.  This royalty is a minimum of about $24 million.

> c.     In SOW § 4(a), in the scenario where Ethos Consulting terminates without cause during development, Ethos Consulting must pay a percentage of the royalty (1% for each month that elapsed starting October 23, 2017).  Here, the termination payment is 8% of the royalty or $1.96M.

163.     Notwithstanding these representations, Terek and Ethos Group never intended to pay the royalty (upon completion) or the termination payment (a percentage of the royalty upon

29

termination without cause during development), and Ethos Consulting during all relevant times did not have sufficient funds to pay its debts without support from Terek and its affiliates.

164.    Terek and Ethos Group made the above statements embodied in the 2017 Written Agreement, as well as similar extra-contractual statements, with the intention to trick and induce VoterLabs to agree and develop at an extremely low price.

165.    Terek and Ethos Group had no intention of paying for the services, as reflected by the scheme recently uncovered and described below.

**B.    Further Information about the Fraudulent Misrepresentations**

**(i)    Background**

166.    Terek is a Texas resident.

167.    In 1996, Terek started Ethos Inc.  Ethos Inc. is a Texas corporation with its principal place of business in Irving, Texas.  Ethos Inc. is registered to do business in Delaware.

168.    In 2008, Terek started the following entities:

a.    Ethos Holdings is a Delaware corporation with its principal place of business in Irving, Texas.

b.    Ethos Resources is a Texas corporation with its principal place of business in Irving, Texas.

c.    Ethos Group PD, Inc. ("Ethos PD") is a Delaware corporation with its principal place of business in Irving, Texas.

d.    Ethos Group Services, Inc. ("Ethos Services") is a Delaware corporation with its principal place of business in Irving, Texas.

e.    Ethos Consulting is a Delaware manager-managed limited liability company with its principal place of business in Irving, Texas.

169.    Terek owns 100% of Ethos Holdings.

170.    Terek also controls Ethos Resources, Ethos PD, Ethos Services, and Ethos Consulting.

30



171.    There are many more "Ethos" entities as well.  Terek often changes their names in all various ways (including by switching "Ethos" to other words like "EG" or "Custegra"), as well as continually creates new entities in Texas and Delaware.

172.    Upon information and belief, Ethos PD and Ethos Services serve as sub-holding companies, with Ethos Services having little or no assets except ownership interests in various shell entities like Ethos Consulting.

173.    At all relevant times, Terek was the only director Ethos Inc., as well as Ethos Holdings, Ethos Resources, and Ethos Consulting.

174.    At all relevant times, Terek was the President and CEO of Ethos Inc., as well as Ethos Holdings, Ethos Resources, and Ethos Consulting.

175.    The only entity with any employees is Ethos Resources.  Pursuant to a written Services Agreement dated January 1, 2009, Ethos Resources purports to provide its affiliates with workers in return for the actual costs incurred by Ethos Resources.  In reality, Ethos Inc. simply transfers funds to Ethos Resources bi-weekly so Ethos Resources can make payroll.

176.    All said "Ethos" entities operated out of the Mustang Building at 5215 N. Connor Blvd, Irving, Texas 75039 until they subsequently moved to the Music Factory at 370 West Las

Colinas Blvd., Suite 108, Irving, Texas 70539.  The latter address is a 100,000 square foot four-story office building.  Ethos Resources paid the construction costs.   The owner who pays taxes on 370 Las Colinas Boulevard Suite 108 is "Terek Dave DBA:  Ethos Group".

177.    Terek is the "boss"; all relevant persons (Jeff Thomas, Scarlett Shipp, Don Judice, William Surprise, Ethos IT leadership team) reported to him; he was required to approve all key decisions.

178.    Terek d/b/a Ethos Group, and Ethos Inc., with Ethos Resource personnel, were the driving force behind the 2017 Written Agreement, and are the driving force behind the present-day continued efforts to avoid payment for services rendered under the 2017 Written Agreement.

    **(ii)    <u>Misrepresentations regarding the $1/Vehicle Royalty</u>**

179.    As noted, Terek started Ethos Inc. in 1996.

180.    Terek worked with dealerships throughout the United States, providing them with training services and other products to help the dealerships sell finance and insurance ("F&I") and related add-on products to the dealerships' customers (everyday people that purchase vehicles from the dealerships).  Ethos Inc. is the contract signatory on the F&I products and received the money from the dealership customers who purchase F&I products.

181.    Ethos Inc. collected data from the dealership's dealer management systems ("DMS")—the customer name, address, contact information, vehicle purchased, any F&I or add-on products purchased, and related information.  This substantial amount of data was stored by Ethos Inc. on Azure databases.

182.    In 2016, Mr. Jeff Thomas managed Ethos Inc.'s core products and reported directly to Terek.

183.    In 2016, an Ethos Group sales trainer suggested to Jeff Thomas that he reach out to VoterLabs, which Jeff Thomas did on April 4, 2016.

184.    As noted above, in Paragraphs 9-16 above, VoterLabs and Ethos Consulting entered into the 2016 NDA and a small-scale Interim Agreement in 2016, for which Ethos Inc. paid VoterLabs $55,000, which included a "Product Opportunity Analysis" for VoterLabs to suggest ideas how Ethos Group could leverage its data to increase revenue.

185.    On Wednesday, March 29, 2017, on a video telephone call with Mr. Kawecki, Mr. Thomas, and Mr. Terek, the three men talked about what Kawecki and Thomas had been working on together.  Mr. Kawecki was attempting to get approval and put in place a written contract to cover a proof-of-concept "Beta" that VoterLabs and Ethos Group had been conceiving and creating.  Among the materials screen-shared during this discussion was the "Roadmap" (the document entitled "Master_Roadmap_March_2017_ETHGRP.pdf"), which summarized all of VoterLabs' ideas resulting from the product opportunity analysis.

186.    The next day Terek asked for VoterLabs to send the materials (including the Roadmap) to him:

| Mar. 30, 2017 | 12:18:08 PM | Jeff Thomas | Is there a way to get Walters stuff he showed us yesterday sent to me and you?<br><br>From Dave |
|---|---|---|---|
| Mar. 30, 2017 | 12:18:57 PM | Walter Kawecki | Yup - i'll get it over to you this afternoon! |
| Mar. 30, 2017 | 12:20:34 PM | Jeff Thomas | Thanks! |
| Mar. 31, 2017 | 12:22:24 PM | Walter Kawecki | Was out of the office yesterday afternoon and thought I had it on the computer with me, cleaning up a little bit more get it over to you bit later. Just keep in mind that it is a working document and not a sales presentation. |

187.    Terek then invited Kawecki to Texas the following week.

188.    On April 6, 2017, Terek gave a presentation in a conference room at Ethos Group's offices and represented to VoterLabs that he was considering an IPO.  Someone from

33

Ethos Group created a huge print out of VoterLabs' Roadmap, while Terek gave his presentation on a large video screen next to the Roadmap.  Terek's presentation also included information on VoterLabs.  On this same day, Terek then met with Kawecki, rejected the small-scale written contract for the "Beta", and asked that VoterLabs develop its ideas on the Roadmap at cost with the reward ($1/vehicle) payable upon completion.[2]

189.    Terek now claims that there was never an IPO being considered, he never gave any such presentation, and he never made any such statements to VoterLabs' Kawecki.  This claim is false.  Terek did in fact make such representations at the April 6, 2017 meeting.

190.    Terek's representations about an IPO were intended to, and did in fact, induce VoterLabs to agree to a contractual structure where VoterLabs would accept less during development and delay the reward ($1/vehicle royalty) until later.  However, as explained herein, Terek and Ethos Group never had any intention of paying a royalty upon completion.

**(iii)    <u>Misrepresentations regarding the Termination Payment</u>**

191.    After the April 6, 2017 meeting, VoterLabs' Kawecki—who trusted Terek—began trying to scope out what would be involved, the estimated cost, and various related tasks.  The April 24, 2017 "Project Overview" was his best effort in this regard.  On the first page of the Project Overview, it states:

> **Core Objectives:**
>
> →    Increase / optimize the number of vehicles/units sold by Ethos Group partners
> →    Increase / optimize the number of add-on products sold by Ethos Group partners
> →    Aid in expanding Ethos Group into the tech sector
> →    Help maximize Ethos Group valuation multiple ahead of anticipated IPO

---

[2]    In 2016, the dealerships affiliated with Ethos Group sold approximately 600,000 vehicles, and in 2017, the dealerships sold approximately 700,000 vehicles.  Ethos Group personnel had at various times stated the belief that the number of vehicles would be north of 1,000,000 within a few years.

192.    The purpose of the 2017 Written Agreement was to help dealerships (*i.e.*, "Ethos Group partners") sell more vehicles and therefore more of Terek's and Ethos Inc.'s F&I and add-on products.  This purpose is reflected in the plain language of the 2017 Written Agreement. The functions of the software described in SOW § 1—an applications platform performing machine learning, AI, and predictive analytics, along with other functions, for use by dealership employees, that brings the data together to help the dealership employees to better interact with their customers when they walk into the dealership looking to buy vehicles and F&I and add-on products.

193.    On June 12, 2017, VoterLabs began work when Ethos Inc. paid $109,700.  There was still no written contract.  VoterLabs and Ethos Group simultaneously worked on the project while VoterLabs tried to put in place a written contract.

194.    In regard to a written contract, VoterLabs' Kawecki quickly noticed that Terek's proposed structure (low development price, reward later in the form of $1/vehicle royalty upon completion) left VoterLabs' vulnerable if the project was terminated without cause after substantial development had occurred but before completion, and therefore some mechanism to fairly compensate VoterLabs for its services would be required in that event.

195.    VoterLabs sent the first draft of a written contract on August 2, 2017.

196.    VoterLabs proposed as follows in Section 6, Subpart (a), Subpart (iii):

"6.  Termination.

(a) Ethos may terminate … at any time and for any reason, upon sixty (60) days prior written notice to Vendor [VoterLabs] … without liability or penalty, except that, notwithstanding anything contained in the Agreement to the contrary, Ethos will be obligated to pay … (iii) if there are any royalty payments to which VoterLabs would [be] entitled under any statement of work hereunder, VoterLabs shall be entitled to a percentage of such royalty payments equal to the quotient of (y) the number of days from the date of such statement of work and the date of such termination and (z) the total

number of days between the date of such statement of work and the scheduled date of completion of such statement of work, if the quotient would be greater than 50%."

197.    The equation can be fairly described as follows:

$$\text{IF} \quad \frac{\text{\# of days from the start until termination without cause}}{\text{\# of days from the start until scheduled date of completion}} \quad > \quad 50\%$$

THEN VoterLabs is entitled to that percentage of the royalty.

198.    The same equation was in another August 18, 2017 draft exchanged between the parties and reviewed by Ethos Group and its general counsel.

199.    This equation only makes sense if it operates during development and prior to completion of the project.

200.    Sometime after August 2017, Terek and Ethos Group hired Wick Phillips and, on or about October 24, 2017, someone from Ethos Group presented VoterLabs' Kawecki with a substantially new written contract draft.  In the new written draft, the right to terminate without cause with 60 days written notice was kept in, but the termination payment equation was deleted.

201.    On October 24, 2017, Kawecki and Terek met in person, and then with Ethos Group's general counsel, to discuss this new written draft.  During these meetings, Kawecki stated that the termination payment provision that was deleted should be added back in and that the termination payment should be some percentage of the royalty.  Ethos Group's counsel, Mr. Surprise, embedded a placeholder for this particular comment in SOW § 4(a).

202.    On November 2, 2017, VoterLabs proposed a new equation that the termination payment should be 1% of the royalty for each full month that elapses during development (starting October 23, 2017).  Thus, if Terek and Ethos Group terminated without cause effective January 24, 2017, VoterLabs would receive 3% of the royalty since three full months elapsed.

This new equation naturally capped the termination payment at about 15-20% of the royalty. This new equation also only makes sense if it operates during development and prior to completion of the project, since it becomes irrational during the period after completion of the project.

203.    On November 6, 2017, Terek and Ethos Group "respectfully disagree[d] with the proposed termination fee provision []wherein Ethos Group pays a percentage of the royalty fee" and instead proposed that "Ethos Group will pay a one-time fee of $250,000.00."

204.    On November 21, 2017, VoterLabs reinserted its 1% of the royalty for each month that elapses equation and indicated in a comment its belief that this provision had been agreed to:  "As agreed to, termination payment = 1% of royalty for each month before license/royalty payments starts."

205.    On November 30, 2017, Ethos Group's counsel, Mr. Surprise, wrote an email to VoterLabs stating:  "As discussed, the attached agreement represents the terms to which you and Dave [Terek] had agreed to."  The attached agreement to Mr. Surprise's email had almost verbatim VoterLabs' proposal that the termination payment equals 1% of the royalty for each month that elapses, with only slight immaterial edits made by Mr. Surprise.

206.    Ethos Group's counsel, Mr. Surprise, testifying as a corporate representative, stated that he could not have sent the November 30, 2017 email accepting the termination payment proposal VoterLabs had made without Terek's approval.  Terek himself acknowledges that Mr. Surprise's November 30, 2017 email is accurate.

207.    However, Ethos Group's counsel, speaking as a corporate representative, explained that *at the same time* Ethos Group was representing to VoterLabs its agreement to the termination payment provision, Ethos Group was rationalizing internally that it would not pay

the termination payment—despite the above negotiating history and representations that it would—by telling itself (but not VoterLabs) that the results of the calculations in VoterLabs' various August and November 2017 equations would always be $0 because the royalty was $0 until completion, since any percentage multiplied by $0 is always $0.

208.    In other words, when Terek and Mr. Surprise stated to VoterLabs that they agreed to the termination payment provision, they thought to themselves—but did not state to VoterLabs—that what Terek and Ethos Group were agreeing to was (1%) x (# of months that elapse) x ($0 royalty) = $0.

209.    Both the royalty (upon completion) and the termination payment provision (upon termination without cause during development) were included in the 2017 Written Agreement. Terek and Ethos Group had no intention of paying either.

210.    By November 2017, VoterLabs had released a version of the software to select dealerships for testing and feedback.  The software relied on VoterLabs' pre-existing data engine technology, and VoterLabs had brought on a data scientist for the project to begin the advanced machine learning, AI, and predictive analytics phase.  The product had a tentative name ("Neos" or "NeosAI", which name later changed to NeosInsight and other variations).  VoterLabs was actively interviewing and adding workers to the project.

211.    The 2016 NDA had an anti-reliance provision.  Above and beyond the 2016 NDA, putting representations in writing in the written contract was the key item both sides required in order to rely and move forward.  Mr. Terek knew this and expressed it to VoterLabs' Kawecki as their negotiations were wrapping up:

| Dec. 7, 2017 | 8:18:49PM | Walter Kawecki | How's 12:30 your time? |
| Dec. 7, 2017 | 8:19:20PM | David Terek | That will work |

| Dec. 7, 2017 | 8:20:39PM | Walter Kawecki | Great, should we send out conference call instructions, or is there someone over there I should email to set it up? |
| Dec. 7, 2017 | 8:21:43PM | David Terek | Email William/Jeff to set up the call |
| Dec. 7, 2017 | 8:22:05PM | Walter Kawecki | Sounds good, talk to you tomorrow! |
| Dec. 7, 2017 | 8:25:38PM | David Terek | Look forward to the call…getting it all done and on paper…we both need to be satisfied…allows us to create and continually innovate!! |
| Dec. 7, 2017 | 8:26:02PM | Walter Kawecki | Yes indeed! |

212.    Terek and Ethos Group intentionally mislead VoterLabs by stating it would receive the royalty (upon completion) or the termination payment (upon termination without cause during development), memorialized in the 2017 Written Agreement itself, to induce VoterLabs to keep working at the low development estimate, when in fact Terek and Ethos Group had no intention of ever doing so.

**(iv)    Misrepresentations regarding Ethos Consulting**

213.    Confirming that Terek and Ethos Group had no intention of paying either the royalty (upon completion) or the termination payment (upon termination without cause during development) is the fact that Ethos Consulting is a shell and sham entity that serves as a mere instrumentality of Terek and his "Ethos" entities and which Terek and Ethos Group, by design, exists and is used to avoid payment obligations without regard to contract terms or the law.

214.    The VoterLabs contract required Ethos Consulting to make periodic engagement payments during development of the software of approximately $1.5 million over an estimated 24 months.

215.    However, on September 30, 2016, Ethos Consulting had $1,110 in its bank account.

216. Beginning on January 1, 2017 and ending on January 31, 2017, Ethos Consulting had $1,100 in its bank account.

217. Beginning on January 1, 2018 and ending on January 31, 2018, Ethos Consulting had $1,100 in its bank account.

218. At all relevant times, in 2016, 2017, and 2018, Ethos Consulting had only one (1) bank account.

219. Ethos Consulting did not itself have sufficient funds (without help from Terek or its affiliates) to make the engagement payments to VoterLabs.

220. Nor did Ethos Consulting have any workers.

221. Ethos Inc. made the engagement payments.

222. Ethos Resources provided the workers.

223. Terek and the corporate representative of Ethos Inc., Ethos Resources, and Ethos Consulting claim that Ethos Resources provides Ethos Consulting services (in the form of workers) under the Services Agreement dated January 1, 2009 between them, for which Ethos Resources charged Ethos Consulting a certain price (the actual cost of the workers), and Ethos Consulting used those workers to perform services for Ethos Inc. (training dealership employees to sell F&I products) until a non-existent unwritten contract between them, for which Ethos Consulting charged Ethos Inc. a certain price (which price according to Defendants fluctuates so that it always equals exactly the price Ethos Resources charges Ethos Consulting for the workers), and since the price Ethos Resources charges Ethos Consulting is always exactly the price Ethos Consulting charges Ethos Inc., Ethos Inc. transferred funds from its bank account directly to Ethos Resources' bank account.

40

224.    According to this pre-textual explanation, Ethos Consulting's existence consists of generating revenue from the services it provides Ethos Inc. and then taking that revenue—all of it—and paying it all to Ethos Resources.

225.    Based on the foregoing system, when Ethos Consulting enters into a contract (such as the 2017 Written Agreement with VoterLabs), Terek, Ethos Inc., and Ethos Resources can decide whether or not they want to comply with an Ethos Consulting payment obligation, without regard to the contractual terms or the law.

226.    The foregoing system and purpose of Ethos Consulting was set up from its beginning in 2008.  Terek and his Texas-based Ethos Group entities knowingly and intentionally deployed this fraudulent system, which relies on a Delaware entity at its root, against VoterLabs and are attempting to follow through and validate their system, here in Delaware federal court, in plain sight.

227.    VoterLabs was not informed of the foregoing system when it entered into the 2017 Written Agreement and continued to perform believing it would receive either the royalty (upon completion) or the termination payment (upon termination without cause during development).  Instead, the statements made by Terek and Ethos Group—that Ethos Consulting "will pay to Service Provider [VoterLabs] a fee determined in accordance with the fee set forth in each Statement of Work" (Services Agreement § 5.1) and the acknowledgement that Ethos Consulting's "inability to pay its debts generally as they become due" is a breach that strikes at and defeats the very essence of the 2017 Written Agreement (Service Agreement § 8.3) while simultaneously executing the 2017 Written Agreement—were made to mislead and defraud VoterLabs and induced its continued performance of software and analytics development work.

C.    **Mere Instrumentality and Agent**

41

228.    In 2008, Terek started Ethos Consulting.

229.    At the time he did so, Terek purposefully wanted to take advantage of the protections afforded by Delaware law, and freely acknowledges that fact.

230.    Ethos Consulting was and remains a mere instrumentality and agent used by Terek and his "Ethos" entities to contravene contractual obligations and defraud contracting counterparties, precisely as done here with VoterLabs and the 2017 Written Agreement.

231.    Upon information and belief, Ethos Consulting was inadequately capitalized at its formation.  Ethos Consulting's immediate parent company, Ethos Services, formed at the same time, also has no or little assets (except ownership interests in Ethos Consulting and a variety of other shell entities with different names).

232.    Terek operated and operates his entities (Ethos Holdings, Ethos Resources, Ethos PD, Ethos Services, Ethos Inc., and Ethos Consulting), and others, without oversight of a formal board of directors or consulting minority stockholders.

233.    Members of Terek's leadership team do not have any sense or understanding of any distinctions.  As Mr. Thomas, who manages the core products, stated:  "I guess all Ethos Group to me."

234.    Ethos Consulting was grossly undercapitalized to perform its obligations under the 2017 Written Agreement with VoterLabs.

235.    Ethos Consulting also keeps virtually no formal records, except its original operating agreement (amended once to change its name and again to change its office location) and then a single record over the course of its nearly 13 years of existence memorializing Terek's decision as sole manager to name a new secretary (made on May 22, 2017 as VoterLabs would soon be beginning its work on the project).

236.    Ethos Holdings, Ethos Resources, Ethos PD, Ethos Services, Ethos Inc., Ethos Consulting, and others all involve the same workers, in the same office (built with funds promised by Ethos Resources while owned and/or taxes paid by "Terek Dave d/b/a Ethos Group"), with the same offices, same phone numbers, same email, a single infrastructure (and accounting system), same equipment, using the Ethos Group trademark and logo[3], and all part of a single business that trains and provides products to dealerships to help sell more vehicles and therefore more F&I and add-on products so that "Terek Dave d/b/a Ethos Group" can profit.

237.    In effect, based on the information provided by Terek and Ethos Inc., Ethos Resources, and Ethos Consulting, and assuming it is true, Ethos Inc. received the money from the sale of F&I and add-on products, transfers funds to Ethos Resources bi-weekly in order to pay the workers, and Ethos Consulting serves no purpose except as a judgment proof sham to avoid contract liability and judgments.

238.    As noted, Ethos Inc. made a $55,000 payment to VoterLabs under the Interim Agreement in 2016, as well as the first four engagement payments to VoterLabs under the 2017 Written Agreement in 2017 and 2018.  Terek and his workers did not bother to account for any of these payments as being an obligation of Ethos Consulting, until June 30, 2021 in connection with this litigation and as a way to avoid liability and the emerging reality that Ethos Consulting is a mere sham.

239.    Ethos Consulting has been organized and controlled, and its affairs conducted, as to make it merely an instrumentality (or at best an agent) of Terek and Ethos Inc and the other Ethos Group entities that are part of Terek's automotive business, in this matter to defraud

---

[3]


VoterLabs and contravene and avoid the payment obligations under the 2017 Written Agreement with VoterLabs.

**D.    Conspiracy Alternative**

240.    As an alternative to treating Terek and his Ethos Group automotive business entities as one economic unit for the purpose of the 2017 Written Agreement, the behavior of Terek, Ethos Holdings, Ethos Resources, Ethos PD, Ethos Services, Ethos Inc., and Ethos Consulting can be viewed as a conspiracy—in furtherance of the fraud described above.

241.    As noted, Ethos Resources entered into a written contract entitled Services Agreement dated January 1, 2009 with Ethos Holdings, Ethos PD, and Ethos Services.  Ethos Resources separately entered into a Joinder and Consent to the Services Agreement dated January 1, 2009 with Ethos Consulting.  Said contracts provided that Ethos Resources would provide the workers, who would use their judgment when performing work subject to the ultimate control and direction of the responsible officers of the other Ethos entities.  Defendants Ethos Inc., Ethos Resources, and Ethos Consulting have stated and claim that the communications between and among Ethos Resources workers, as well as the communications between and among Terek and the Ethos Resource workers, are instances of the various Ethos entities interacting and communicating with each other.  The documented record in discovery is replete with Terek and his entities (Ethos Inc., Ethos Resources, Ethos Holdings, and Ethos Consulting) communicating and conspiring to do the acts described in this complaint.

**(i)    Object of the Conspiracy**

242.    Terek had an unknown history and sophisticated strategy of contracting with start-ups and other (perceived or real) vulnerable counterparties, taking the benefit upfront but later refusing his part of bargain without probable cause, and then exploiting the transaction costs

associated with litigation to render compensatory damages inadequate and his more vulnerable opponents' to fold. His skills in this regard—as evidence by his manipulation of Delaware entities and law to accomplish his scheme—have grown more refined as time has passed.

243. Here, with VoterLabs, the acts in furtherance of the conspiracy include tricking VoterLabs into providing innovative software development and data analytics services at an extremely low price, by representing that VoterLabs would receive a $1/vehicle royalty (upon completion) or a termination payment equal to a small percentage of the royalty (upon termination without cause during development), with no intention of actually paying such price, attempt to use VoterLabs' ideas and work and put in place essentially identical solutions with other vendors, when the time comes to pay VoterLabs as promised use the malicious breach tactic of first affirming for VoterLabs that an engagement payment that was payable and needed would be made and then withholding it without probable cause and condition it on a release and a license to VoterLabs' IP, require VoterLabs to file suit in Delaware to obtain that same engagement payment withheld without probable cause, rely on the transaction costs associated with litigation (and at every step and stage increase those costs unreasonably if one can get away with it) to defeat VoterLabs' right to a compensatory remedy without regard to the merits, contact VoterLabs owners' family members and employers to make allegations in connection the Delaware litigation without probable cause and/or based on the barest of pretextual reasons, and have a sham entity in place to avoid liability in the unlikely event the vulnerable small business and its owners can withstand all of the above. The object of the conspiracy and these tactics in furtherance of it is to obtain services without paying.

**(ii)     <u>Terek</u>**

244.    Terek made the above described misrepresentations and directed his workers and used his entities to implement the above described scheme, including using Ethos Consulting as a sham, the malicious breach in order to injure VoterLabs, and subsequent attrition tactics in the Delaware litigation.    Terek, who is the "boss", knew of, directed, and/or approved all of his subordinates' and entities' acts.

(iii)    **Ethos Inc.**

245.    Ethos Inc. purposefully participated in the conspiracy, including by making the initial engagement payments to VoterLabs, withholding an engagement payment without probable cause to injure VoterLabs, and funding the Delaware litigation and the various unreasonable tactics.

246.    In participating in said conspiracy, Ethos Inc. knowingly and foreseeably intended to exploit the inadequacies of compensatory damages and the transaction costs associated with litigation in state or federal court in Delaware.

(iv)    **Ethos Resources**

247.    Ethos Resources purposefully participated in the conspiracy, including by drafting and negotiating the 2017 Written Agreement, making statements on behalf of Terek and Ethos Consulting in connection therewith, and subsequently executing Terek's directions concerning Ethos Inc.'s withholding an engagement payment without probable cause to injury VoterLabs, and facilitating Ethos Consulting's filing of claims against VoterLabs in Delaware and managing the Delaware litigation in a manner to unreasonable increase its costs.

248.    In participating in said conspiracy, Ethos Inc. knowingly and foreseeably intended to exploit the inadequacies of compensatory damages and the transaction costs associated with litigation in state or federal court in Delaware.

     **(v)**    __Ethos Holdings__

249.    Ms. Shipp used Ethos Holdings to enter into contracts with AIQ.  The objective of the relationship with AIQ was accomplish an essentially identical solution goal as contemplated by the 2017 Written Agreement with VoterLabs.  Specifically, both expressly contemplated data and predictive analytics being available to dealerships employees during their interactions with a prospective car buyer, to help the dealership better communicate with the potential buyer by understanding who the customer is, their activities and interests along with their potential automotive interests and buying motives.

250.    Ms. Shipp reported directly to Mr. Terek, via text, expressly to ensure that he approved her actions.  In a text to Terek, she wrote:  "I will continue to text if that works for you.  Don't feel you have to respond….unless I am doing something I shouldn't be :-)".

251.    Ms. Shipp reported in detail and forthrightly to Mr. Terek her efforts and plans in regard to VoterLabs and AIQ via text, up to and until May 30, 2018, when an apparent moratorium on such reports in writing was put in place.

252.    Ethos Holdings is and was a holding company with no other operations.  To date there has been no explanation why it would be entering into contracts with a software development company or a data analytics company to attempt to replicate the 2017 Written Agreement with VoterLabs.

253.    Upon information and belief, Ms. Shipp passed and/or made available VoterLabs' confidential information protected by the 2016 NDA to both a software development company and AIQ with whom Ms. Shipp had prior friendship and business relationships, to help facilitate putting in place contracts between them and Ethos Holdings.  Ms. Shipp also disclosed the terms of the VoterLabs-Ethos Consulting contract (the $1/vehicle fee) and encouraged her friends to

propose a similar model.  In the course of this litigation, Ethos Consulting then sought to hide

and make discovery of Ms. Shipp's efforts difficult, including by representing that there were no

contracts between "Ethos Group" (which Ethos Consulting secretly defined to be limited only to

itself Ethos Consulting) and AnalyticsIQ, Inc., while claiming Ms. Shipp had no ulterior motives,

to maintain its still evolving *ex post facto* narratives that VoterLabs' failed to perform.

**E.**    **Jurisdiction concerning Texas Defendants**

254.    Terek used a Delaware entity, Ethos Consulting, to defraud VoterLabs and

contravene the 2017 Written Agreement.  The use of Ethos Consulting in this way was the

precise purpose of its creation and continued existence.  Terek made a choice to continue the

operation of Ethos Consulting since 2008 and for it to be available and used as it has been in this

matter, to defraud a contracting counterparty and evade contractual obligations and the law, with

Delaware as the exclusive forum for disputes between Ethos Consulting and the defrauded more

vulnerable counterparty.

255.    "Delaware takes the potentially fraudulent use of the protections it affords to

entities created under this State's laws very seriously."  *Winner Acceptance Corp. v. Return on

Capital Corp.,* C.A. No. 3088-VCP, 2008 WL 5352063, at *10 n.65 (Del. Ch. Dec. 23, 2008).

256.    Because Ethos Consulting is merely an instrumentality and agent of Terek and his

Ethos Group entities (Ethos Inc. and Ethos Resources), the contacts by Ethos Consulting with

Delaware are attributable to Terek, Ethos Inc., and Ethos Resources.

257.    Ethos Consulting agreed to a choice of forum provision in the 2017 Written

Agreement with VoterLabs:

> "Each Party irrevocably and unconditionally agrees that it will not commence any action,
> litigation, or proceeding of any kind whatsoever against the other Party in any way
> arising from or relating to this Agreement, including all exhibits, schedules, attachments,
> and appendices attached to this Agreement, and all contemplated transactions, including

contract, equity, tort, fraud, and statutory claims, in any forum other than the US District Court for the District of Delaware or the courts of the State of Delaware, and any appellate court from any thereof. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of such courts and agrees to bring any such action, litigation, or proceeding only in the US District Court for the District of Delaware or the courts of the State of Delaware. Each Party agrees that a final judgment in any such action, litigation, or proceeding in conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law."

Services Agreement § 22.

258. Ethos Consulting's consent to this Delaware forum is attributable to Terek, Ethos Inc., and Ethos Resources.

259. Further, for the same reason, Ethos Consulting's decisions to take acts in Delaware and avail itself of the protections of Delaware law, in particular by filing claims against VoterLabs in June 2020 in Delaware federal court arising from and relating to the 2017 Written Agreement, are also attributable to Terek, Ethos Inc., and Ethos Resources.

260. Indeed, throughout Ethos Consulting's claims filed here in Delaware (set forth in D.I. 68-1), Ethos Consulting consistently refers to itself as the equivalent of Ethos Inc. (Terek's entity that actually made the engagement payments):

- "VoterLabs … obtained $676,750 from Ethos Consulting" (D.I. 68-1 (Def.'s Counterclaim ¶ 6));

- "In hindsight, it is now clear VoterLabs spent its time (and Ethos Consulting's money) developing Axilient instead of NeosInsight" (*id.* at ¶ 11);

- "Ethos Consulting paid VoterLabs $55,000 for these initial services" (*id.* at ¶ 15);

- "Between June 8, 2017 and April 26, 2018, Ethos Consulting paid $676,750 which represented payments for Engagement Payments Nos. 1-4 for the development" (*id.* at ¶ 75)

- "Had Ethos Consulting known VoterLabs did not intend to use its money to develop the Ethos Software Project, Ethos Consulting would have not made any payments, would not have entered the Agreements, and/or would have rescinded the Agreement, had VoterLabs disclosed the extent of its deception" (*id.* at ¶ 82);

- "Ethos Consulting was injured by its reliance by among other things entering into the Agreements and making payments identified herein as Engagement Payments Nos 1-4 …" (*id.* at ¶ 105).

261.    In fact, Ethos Consulting paid VoterLabs nothing.  Ethos Consulting was merely a front, with Terek, Ethos Inc., and Ethos Resources pulling the strings, and Ethos Holding participating, to implement the fraudulent scheme.  Ethos Consulting's fraud claims—and its theory that VoterLabs made misrepresentations to work on "Axilient" rather than "NeosInsight", simply because VoterLabs starting calling it Axilient in 2019—is one of many instances of raising the costs of the litigation.  Ethos Consulting's acts in Delaware, fully supported and made possible by Terek and Ethos Inc and Ethos Resources, are an integral part of accomplishing the scheme.

262.    In all events, Terek, Ethos Inc., and Ethos Resources are closely related to the 2017 Written Agreement and bound by its forum selection clause, as they have had sufficient minimum contacts with Delaware in connection with the fraud and conspiracy complained of such that the maintenance of suit in Delaware does not offend traditional notions of fair play and substantial justice, including (i) not only creating Ethos Consulting, a Delaware entity, but then maintaining and using it in the fraudulent manner against VoterLabs herein described; (ii) supporting the operations of Ethos Consulting and directing it to act on behalf of and to benefit Terek and Ethos Inc. (not only funding and directing Ethos Consulting's entering and performing the written contract at issue but also funding and directing Ethos Consulting's filing of claims against VoterLabs in June 2020 in Delaware arising out of and relating to the written contract at issue); and (iii) forcing litigation in Delaware over an Ethos Consulting engagement payment obligation that Ethos Consulting acknowledged was owed and withheld without probable cause to injure VoterLabs as an integral component to the overall scheme.

**COUNT 1:    Breach of Contract - Payment Number Five (Service Agreement § 8.2 and Statement of Work § 4(a)) [against Ethos Group Consulting Services, LLC]**

263.    Each of the proceeding factual allegations contained above is incorporated herein, as if fully set forth.

264.    The 2017 Written Agreement constitutes a valid, binding, and enforceable contract by and between plaintiff VoterLabs and defendant Ethos Group Consulting.

265.    VoterLabs has complied in all material respects with its obligations under the 2017 Written Agreement.

266.    Ethos Group Consulting breached the 2017 Written Agreement by failing to make Engagement Payment Number 5 on June 7, 2018 or within a reasonable time thereafter.

**COUNT 2:    Breach of Contract - Termination Payment (Service Agreement § 8.2 and Statement of Work § 4(d)) [against Ethos Group Consulting Services, LLC]**

267.    Each of the proceeding factual allegations contained above is incorporated herein, as if fully set forth.

268.    Ethos Group Consulting breached the 2017 Written Agreement by failing to pay make the termination payment on July 20, 2018 or within a reasonable time thereafter.

**COUNT 3:    Malicious Breach of Contract [against Ethos Group Consulting Services, LLC]**

269.    Each of the proceeding factual allegations contained above is incorporated herein, as if fully set forth.

270.    As described above, Ethos Group Consulting breached its obligation to make Engagement Payment No. 5 without probable cause, in a malicious manner, with the explicit aim of harming VoterLabs and then exploiting VoterLabs' vulnerable position to capture un-bargained-for benefits, based on an expectation that VoterLabs would be unable to protect its rights.

**COUNT 4:**          **Fraud [against Ethos Group Consulting Services, LLC]**

271.    Each of the proceeding factual allegations contained above is incorporated herein, as if fully set forth.

272.    Ethos Consulting falsely represented facts as identified in Paragraphs 160-165 above.

273.    Ethos Consulting knew or believed that the representations were false or made the representation with a reckless indifference to the truth, as explained in Paragraphs 179-239 above.

274.    Ethos Consulting induced VoterLabs to act in justifiable reliance upon those misrepresentations, which VoterLabs did and suffered injury.

**COUNT 5:**          **Fraud [against David Terek]**

275.    Each of the proceeding factual allegations contained above is incorporated herein, as if fully set forth.

276.    Terek falsely represented facts as identified in Paragraphs 160-165 above.

277.    Terek knew or believed that the representations were false or made the representation with a reckless indifference to the truth, as explained in Paragraphs 179-239 above.

278.    Terek induced VoterLabs to act in justifiable reliance upon those misrepresentations, which VoterLabs did and suffered injury.

**COUNTS 6-9:**          **Alter Ego [against David Terek]**

279.    Each of the proceeding factual allegations contained above is incorporated herein, as if fully set forth.  VoterLabs repeats Counts 1-4 as if fully stated against David Terek as Counts 5-8.

**COUNTS 10-13:**     **Alter Ego [Against Ethos Group, Inc.]**

280.    Each of the proceeding factual allegations contained above is incorporated herein, as if fully set forth.  VoterLabs repeats Counts 1-4 as if fully stated against Ethos Inc. as Counts 9-12.

**COUNTS 14-17:**     **Alter Ego [Against Ethos Group Resources, Inc.]**

281.    Each of the proceeding factual allegations contained above is incorporated herein, as if fully set forth.  VoterLabs repeats Counts 1-4 as if fully stated against Ethos Resources as Counts 13-16.

**COUNTS 18-21:**     **Alter Ego [Against Ethos Group Holdings, Inc.]**

282.    Each of the proceeding factual allegations contained above is incorporated herein, as if fully set forth.  VoterLabs repeats Counts 1-4 as if fully stated against Ethos Holdings as Counts 17-20.

**COUNT 22-26:**     **Civil Conspiracy [Against Ethos Group Consulting Services, LLC; David Terek, Ethos Group, Inc.; Ethos Group Resources, Inc.; and Ethos Group Holdings, Inc.]**

283.    Each of the proceeding factual allegations contained above is incorporated herein, as if fully set forth.  In the alternative to alter ego, VoterLabs asserts these claims of conspiracy. Counts 22 is against Ethos Consulting, Count 23 against Terek, Count 24 against Ethos Inc., Count 25 against Ethos Resources, and Count 26 against Ethos Holding.

284.    Defendants Ethos Consulting, Terek, Ethos Inc., Ethos Resources, and Ethos Holdings are a combination of four separate entities and one director, manager, and executive from the different companies that all conspired together to achieve the objective of the conspiracy using the tactics as set forth in Paragraph 241 above.

285.    Said defendants had a meeting of the minds on this object and undertook a course of action, committing one or more unlawful overt acts, including, but not limited to, the creation, maintenance and ultimate use of a sham Delaware entity, the fraudulent misrepresentations concerning the royalty, termination payment, and nature of Ethos Consulting, withholding Engagement Payment No. 5 without probable cause, requiring litigation in Delaware over an amount withheld without probable cause, and the various tactics to harass and increase the cost of litigation in the subsequent Delaware Court litigation.

286.    As described herein, VoterLabs has suffered damages, to which the defendants should be jointly and severally held liable.

## REQUEST FOR RELIEF

WHEREFORE, plaintiff demands judgment against the defendants and respectfully requests that the Court award damages as follows:

a)      $195,450;

b)      8% of the expected royalty under the 2017 Written Agreement;

c)      Interest pursuant to 6 Del. Stat. § 2301;

d)      Attorney fees and other consequential and exemplary damages in an amount to be determined;

e)      Costs of suit; and

f)      Any other relief the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues so triable.

*Of Counsel*:

James W. Bergenn, Esq.
Christopher J. Cahill, Esq.
SHIPMAN & GOODWIN LLP
One Constitution Plaza
Hartford, Connecticut 06103-1919
Tel.:  (860) 251-5000
Fax:  (860) 251-5219
jbergenn@goodwin.com
ccahill@goodwin.com


Dated: August 13, 2021

/s/ Nicole K. Pedi
Travis S. Hunter (#5350)
Nicole K. Pedi (#6236)
RICHARDS, LAYTON & FINGER, P.A.
920 North King Street
Wilmington, DE 19801
(302) 651-7700
(302) 651-7701
hunter@rlf.com
pedi@rlf.com

*Attorneys for Plaintiff VoterLabs, Inc.*